JAMES DEERING *versus* PROPRIETORS OF LONG WHARF.

Where the grantors, for a certain consideration, "give, grant, bargain, sell and convey" to the grantee, his heirs and assigns, "a certain gore or strip of flats" described in the deed, "the said strip or gore to begin at the lower end of Milk Wharf, so called, and to run four hundred and eighty feet towards the channel. And the said (grantors,) for the consideration aforesaid, hereby release to the said (grantee) or to any other person or persons that may build any wharf on the western line of said strip of flats and in the continuation of the said new wharf and on the line thereof to the eastward, all our right, title and interest to the said gore of flats to the channel, or so far as our right extends, for the use and benefit of the proprietors of the wharf which may be built as aforesaid. To have and to hold the said granted and bargained premises, with the privileges and appurtenances thereof, to the said (grantee,) his heirs and assigns, to his and their use and behoof forever." After this follow the usual covenants in a warranty deed. — *It was held,* that by the first description was conveyed to the grantee named, and to his heirs and assigns, an absolute estate in fee of the premises so described; and that by the second, all the right, title and interest of the grantors in the premises thus described, be the same more or less, passed to the grantee named in the deed, and not "to the use and benefit of the wharf which might be built."

The owner may lawfully erect wharves upon his own flats, for his own use and benefit; but the public have the right equally with him to pass and repass with vessels and boats upon and over the water where there is no occupation with wharves or buildings.

If the language used in a deed of land indicates clearly the intention of the parties, that intention will stand, notwithstanding the law may prevent its being carried into effect.

Although neither the habendum nor the covenants in a deed can control the premises, when the latter are free from doubt; yet upon a question of intention of the parties in reference to the premises, the language used in the habendum and covenants may be important and sometimes decisive, and may appropriately be taken into consideration.

The owners of upland to which flats adjoin may sell the upland without the flats, or the flats without the upland.

WRIT of entry demanding a strip of flats ground in Portland, situated easterly of and near to Long Wharf, and extending from a line passing by the end of Milk Wharf to low mater mark.

On June 26, 1796, John and Lucy Nichols made a deed to Nathaniel Deering; and the main questions in controversy

between the parties grew out of the construction to be given to that deed. A copy follows : —

" Know all men by these presents, that we John Nichols of Portland in the county of Cumberland, and Lucy, wife of the said John, in her right, in consideration of the sum of ten pounds ten shillings lawful money, paid us by Nathaniel Deering of said Portland, the receipt whereof we do hereby acknowledge, do hereby give, grant, bargain, sell and convey unto the said Nathaniel Deering, his heirs and assigns forever, seven eighth parts of a certain gore or strip of flats in Portland aforesaid, between the flats belonging to the said John, Nathaniel and others, and flats belonging to Joseph Holt Ingraham and which he purchased of the heirs of Ephraim Jones, deceased, which said strip is in common to the said John and Lucy and the said Ingraham in the right of his wife Abigail, deceased ; the said strip or gore to begin at the lower end of Milk Wharf, so called, and to run four hundred and eighty feet towards the channel. And the said John and Lucy in her said right, for the consideration aforesaid, do hereby release to the said Nathaniel, or to any other person or persons that may build any wharf on the western line of said strip of flats, and in the continuation of the said new wharf and on the line thereof to the eastward, all our right, title and interest to the said gore of flats to the channel, or so far as our right extends, for the use and benefit of the proprietors of the wharf which may be built as aforesaid. To have and to hold the said granted and bargained premises, with the privileges and appurtenances thereof, to the said Nathaniel Deering, his heirs and assigns, to his and their use and behoof forever. And we, the said John and Lucy, for us, our heirs, executors and administrators, do covenant with the said Nathaniel Deering, his heirs and assigns, that we are lawfully seised in fee of the premises ; that they are free of all incumbrances ; that we have good right to sell and convey the same to the said Nathaniel as aforesaid ; and that we will warrant and defend the same to the said Nathaniel, his heirs and assigns, forever,

against the lawful claims and demands of all persons. In witness whereof," &c.

The demandant had become the owner of the demanded premises, so far as private rights extended, with the exception of whatever right passed to the wharf proprietors by said deed. The facts are stated in the opinion of the court.

The tenants were defaulted ; and the case was submitted, on the report of the Judge, to the decision of the whole court; and if the demandant was not entitled to recover, the default was to be taken off and a new trial granted.

*Howard & Shepley,* for the tenants.

By the deed from John and Lucy Nichols, of June 26, 1790, the interest of John and Lucy Nichols (which they held in the right of the said Lucy) passed to Nathaniel Deering, to the use of the said Nathaniel or of any other person or persons that might build any wharf on the western line of said strip of flats, and in continuation of said new wharf and on the line thereof to the eastward. The " new wharf," the continuation of which is referred to in said deed, was the same as that afterwards called " Deering's Wharf."

Deering's Wharf, as the case finds, was erected a short time previous to the date of the deed from John and Lucy Nichols, and the " continuation" of said wharf was erected by the defendants, (Nathaniel Deering being one of them) immediately after the date of said deed as contemplated by the parties, and by the terms of the deed. This conveyance having been made to Nathaniel Deering to the use of the said Nathaniel and the others who should continue said wharf, he stood seized to the uses, and the statute of uses executed the use, and vested the legal estate in the defendants, who (including the said Nathaniel,) have made the continuation contemplated by the deed. *Thacher* v. *Omans,* 3 Pick. 521.

The continuation of the wharf, an act to be done *in futuro,* would constitute a good consideration for a deed of bargain and sale to take effect *in futuro.* *Green* v. *Thomas,* 2 Fairf. 318 ; 1 Johns. Cas. 91 ; 11 Johns. R. 351 ; 20 Johns. R. 87 ; 3 Wend. 233 ; 4 Mass. R. 136.

The second clause in the deed from John and Lucy Nichols clearly relates to the same land described in the first part of the description. There is no other description of any other parcel of flats, and there is but one gore of flats described in any part of the deed. The expression, therefore, "the said gore," in the last paragraph, must refer to and describe the gore, and the only gore previously described.

The premises referred to in the second clause in the deed can only be located by reference to the description in the first clause. The well settled principle of construction of deeds is, that effect should be given to every part of the deed. Co. Litt. 36, (a); Bracton, Lib. 2, folio 94 — 5.

Applying the principle to the deed in question, the second clause must refer to the same gore described in the first clause, or it can have *no operation whatever*; for the case finds, that the gore described and bounded in the first clause is of greater extent than the ownership of the grantors. And that so far from their having any thing more to convey below that gore, the terminus of 480 feet is of itself below low water mark, and of course below where their ownership or propriety in the flats ceased, and the right of the sovereign or the State attached. "*Idem semper refertur proximo antecedenti.*" Co. Litt. 20. (b).

Where a deed admits of two constructions, the one conformable to, and the other contrary to law, the former is preferred. Co. Litt. 42, (a.) 183, (a.) (b). 1 Wend. 388.

*What gore* then if not the demanded premises, was conveyed by the second clause? The grantors had no other to convey; describe no other; give no other metes and bounds.

They had conveyed in the first clause, not only all the land they had, but had undertaken to convey even more, and to include a portion of flats below low water mark belonging to the State. This very difficulty they undertook to correct in the second clause.

The line of low water mark, being an uncertain boundary, and the grantors not knowing whether it might not extend below low water mark, or fall short of it, they change the

terminus of 480 feet, and substitute for it, "the channel, or so far as our right extends," thus enlarging the grant to go below the 480 feet and to the channel, if their right extended to the channel, or limiting the grant to the line of low water above the 480 feet, if the right extended only thus far.

Thus the latter clause was designed to explain and qualify the first, to designate more clearly the extent of the convey- ance, and to operate as a declaration of the uses.

The habendum in the deed, being to the said Nathaniel, without any " declaration of the uses," would not control the declaration of uses in the premises, for it is well settled, that the premises shall control the habendum, and that if the habendum is repugnant to the premises it is void.    *Corbin* v. *Healy*, 20 Pick. 514; *Sumner* v. *Williams*, 8 Mass. R. 162.

The deed of John and Lucy Nichols having vested in the proprietors all the interest and estate they had in the premises, nothing passed by the subsequent conveyance of Lucy Nichols to the plaintiff.

As this suit, however, originated in an attempt on the part of the plaintiff to deprive the defendants of coming over these flats to their wharf, and an assertion of a right on his part to obstruct the free passage of boats and vessels over the flats to Long Wharf; and as the defendants, in addition to their title by deed to the premises, claim also a right to enjoy the use of the dock as appurtenant to their wharf, as they have used and enjoyed it for forty years and more, it may not be amiss to consider their rights in this respect as independent of the deed.

By the common law, the shore of the sea, between common high water and low water mark, belonged to the king, and was not the subject of private property without a special patent or grant.    Sir Matthew Hale, *De jure maris et brachiorum ejus- dem*, commonly cited as Hargrave's tract, *de jure maris*, c. 4th; 2 Black. Com. 262; Co. Lit. 261, (a.); *Storer* v. *Free- man*, 6 Mass. R. 438.

By the colonial ordinance of 1641, this principle of the common law was so far modified, as to yield to " the proprietor of the land adjoining" propriety to the low water mark, where

the sea doth not ebb above one hundred rods ; provided that such proprietor shall not by this liberty have power to stop or hinder the passage of boats or other vessels in or through any sea, creeks, or coves to other men's houses or lands. Mass: Col. Ord. of 1641, c. 63, § 3.

This colonial ordinance, (although virtually repealed by the repeal of the charter under which it was passed) is the foundation of the private property in the flats on the shore of the sea, or of any of its arms, coves, or creeks, or wherever the tide ebbs and flows. It is, however, a qualified property in the individual proprietor, subject to the public use ; and the "propriety" which the owner of the land adjoining may have and use, and the only one which he can recover at law is such an interest as will not interfere with that use which the public and the owners of adjacent houses and lands possess and enjoy of common right and by the law of nations.

And here we would suggest a doubt whether the "propriety" in flats, thus conferred by the ordinance of 1641, was originally any thing more than a privilege or appurtenance of the "land adjoining," and not an estate which could be severed from it and conveyed by a separate instrument to a separate proprietor, so as to authorize him to commence a real action and obtain a judgment, or writ of possession, to confer on him the exclusive fee without a reservation of the public use. The ordinance of 1641 thus treats it, and speaks of it as a mere "*liberty*," using the expression, "by this liberty." How can such an ordinance have granted the fee in all the shore of the sea and divested the State of all title, without using any words of conveyance, or naming specifically any grantees? It is of itself a mere "liberty." It is true that there are *three obiter dicta* of the Court in Massachusetts, that the flats may be alienated and sold separately from the upland. *Storer* v. *Freeman*, 6 Mass. R. 439 ; *Valentine* v. *Piper*, 22 Pick. 85 ; *Mayhew* v. *Norton*, 17 Pick. 357. But in neither of these cases do the Court give any authority or reasons for extending the "propriety" or "liberty" in the flats to any others, than the owners of the adjoining upland, to whom it

is expressly confined by the terms of the ordinance. And although we may by a succession of such decisions in Massachusetts and Maine consider this question as settled, it is difficult to perceive how the Court ever arrived at any such construction.

The defendants then have the right to pass and repass with their vessels and boats over the demanded premises to their wharf.

1st. This right they have by virtue of the conveyance of John and Lucy Nichols to their use in 1790.

2d. They have this right to pass and repass by the common law and the law of nations. Justinian Inst. Lib. 2, c. 1, § 4 and 5; Code Napoleon, No. 538, 650; Sir Matthew Hale, *De jure maris*, c. 4 and 5; *Rex* v. *Smith*, Dougl. 425.

3d. This right they have by prescription, to use these flats as appurtenant to their wharf adjoining; and have at least an easement in the premises, their possession and use for fifty years, raising the presumption of a grant. *Valentine* v. *Piper*, 22 Pick. 83; *Kent* v. *Waite*, 10 Pick. 138; *Tyler* v. *Wilkinson*, 4 Mason, 397; *Doane* v. *Broad street Association*, 6 Mass. R. 333.

*W. P. Fessenden* argued for the demandant, contending, that by the deed of Nichols and wife to Nathaniel Deering a perfect title, to the extent of four hundred and eighty feet, was conveyed, with covenants of warranty, for the benefit of the owners of the wharf; and that a conveyance of all the right, title and interest of the grantors in all the residue of the flats was made to the grantee for his own individual use and benefit. In aid of his argument he referred to certain principles of law.

The situation of the parties, and of the estate, at the time of the conveyance, may be given in evidence to assist in ascertaining their intention, as expressed in the deed. *Adams* v. *Frothingham*, 3 Mass. R. 353.

To carry into effect the intention of the parties, if not inconsistent with the positive rules of law, is always to be the governing principle in the construction of deeds. And the whole instrument should be taken into consideration, and effect

be given to every part of it, if it can be done. And where there is doubt, the words are to be taken most strongly against the grantor and in favor of the grantee. And if there is then no person in existence to take, any such grant must be void. 1 Shep. Touchstone, 81, 88, 235. Cruise, Title, Deed, c. 23, § 26 ; Bac. Abr. Grant, 395 ; 10 Day, 255 ; *Hall* v. *Leonard*, 1 Pick. 27.

The office of the *habendum* of a deed is to limit and determine the grant. Shep. Touchstone, 75 ; Cruise, Title, Deed, c. 3, § 50.

The question whether the defendants have a prescriptive right, is not open under the general issue. *Miller* v. *Miller*, 4 Pick. 244. It is inconsistent with the claim to the fee of the land.

But the evidence offered, does not show that the defendants have acquired any·right by prescription, but the reverse of it. The use has been common to the demandant and tenants ; and to the public, and neither can acquire title thereby. In such case the law considers the possession to be in him, who has the legal title. *Gray* v. *Bartlett*, 20 Pick. 106 ; *Brimmer* v. *Proprietors of Long Wharf*, 5 Pick. 131.

The opinion of the Court, WHITMAN C. J. having an interest in the subject matter, and taking no part in the decision, was drawn up by

TENNEY J. — On May 31, 1784, Nathaniel Deering and others, the owners of the estate of which James Milk died seized and possessed, by deed of indenture set out a strip of ground extending from the foot of Milk Wharf four hundred and eighty feet towards the channel of Fore River in Portland. and one hundred and six feet easterly, from the easterly side of the street, now called Exchange street, for a wharf. A wharf was afterwards built upon this strip, to the distance of three hundred feet from Milk Wharf, and called Deering's Wharf ; and stores were erected on the west side of the same, before the year 1790. After the 26th day of June, 1790, the wharf was extended towards the channel one hundred and

eighty feet or more, further, and the whole wharf has since been called Long Wharf. On the day last named, John Nichols and Lucy his wife, in her right, in consideration of £10, 10s, gave, granted, bargained, sold and conveyed to "Nathaniel Deering, his heirs and assigns, forever, seven eighth parts of a certain gore or strip of flats in Portland aforesaid, and between the flats belonging to said John, Nathaniel and others, and flats belonging to Joseph Holt Ingraham, and which he purchased of the heirs of Capt. Ephraim Jones, deceased, which said strip is in common to the said John and Lucy, and the said Ingraham in the right of his wife Abigail, deceased ; the said gore or strip to begin at the lower end of Milk Wharf, so called, and to run four hundred and eighty feet towards the channel.

And the said John and Lucy, in her said right, for the consideration aforesaid, do hereby release to the said Nathaniel, or to any person or persons, that may build any wharf on the western line of said strip of flats and in the continuation of said new wharf and on the line thereof to the eastward, all our right, title and interest to the said gore of flats to the channel, or so far as our right extends, for the use and benefit of the proprietors of the wharf, that may be built as aforesaid." Habendum the said granted premises with the privileges and appurtenances thereof to said Nathaniel Deering, his heirs and assigns, to his and their use and behoof forever ; and then are covenants of seizin and warranty to said Deering, his heirs and assigns. The description in this deed embraces the land in controversy. The demandant has the title, which Nathaniel Deering had, and is also the owner of Milk Wharf. Low water mark is between what was called Deering's Wharf and the termination of four hundred and eighty feet from Milk Wharf ; and the channel of Fore River is at some distance further below. Nathaniel Deering and the demandant were from the beginning proprietors in the old and the new parts of Long Wharf, and the latter continues to be a proprietor in each. The proprietors of Long Wharf and the owners of stores thereon, have been accustomed since the year 1793, to

use and occupy the flats easterly of the wharf, claimed by the demandant, as flats are usually occupied in a dock in connexion with a wharf, by vessels coming to the wharf to lade and unlade their cargoes, and the proprietors have claimed and collected dockage of all such vessels. And the demandant and his tenants have always used the same flats for the purpose of passing and repassing with their vessels to Milk Wharf, which vessels have laid thereat in the usual manner without paying wharfage or dockage. The proprietors to the extent of three hundred feet, and those beyond have not been entirely the same persons ; the latter have by agreement collected the wharfage and dockage on the whole and paid to the several proprietors of the former, each the proportion agreed to be paid, the demandant being one.

The tenants contend, that they, having erected the new part of the wharf soon after the execution of the deed from John and Lucy Nichols, are entitled to the flats in controversy, as the persons to whose use the land described in that deed was granted. The proposition of the demandant, on the contrary is, that the deed conveyed to Nathaniel Deering an estate in fee, to the use and behoof of him and his heirs and assigns forever, in the land described in the writ. This question must be settled by the construction to be put upon the deed. " This must be favorable, and as near to the minds and apparent intents of the parties, as possible it may be, and law will permit ; it must be made upon the entire deed, as one part may help to expound another; and if it may be, effect must be given to every word, and none be rejected, if possible, upon a rational exposition, to avoid it ; and the words of the deed are to be taken most strongly against him, who speaks them, and most in advantage of the other party. If, however, there be two clauses or parts of the deed repugnant to each other, the first should be received, and the latter rejected, except there be some special reason to the contrary." Shep. Touch. 86 — 88.

At the time of the execution of the deed from John and Lucy Nichols, the parties thereto had in view a strip of flats, and the ground lying between the side lines thereof extending

to the channel of the river, in which the tide ebbed and flowed ; consequently a part was below and a part above the line of low water ; the upper end of this strip was bounded by Milk Wharf. Whatever right the grantors had in this strip was intended to be conveyed. It is manifest from the language of this deed, as well as of other deeds in the case, that the rights of riparian proprietors to grounds about tide water, and below low water mark, were regarded uncertain and not well defined ; they did not understand at that time, what has since been settled, that their title to the land extended no further than to low water mark. We have reason to believe, from the terms of this deed, that the parties considered the title of the owner of flats to reach as far below the margin of the river at low water, as he chose to erect a wharf ; and that they had rights still further below superior to those of others in the community, but how great, of what kind, or whether to the channel or not, was not clearly understood.

The premises in this deed contain two descriptions, both having reference to this strip of land. The first when taken alone, is perfect, and indicates the land with such clearness, that no doubt can be entertained in relation to its commencement and termination. It extended from Milk Wharf *towards* the channel four hundred and eighty feet, which was to a line below that of low water, but short of the channel ; this was in length coextensive with the ground laid off for a wharf in 1784, by the heirs of James Milk. The other description, in a subsequent and distinct paragraph, is of " said gore of flats," *to* the channel, or so far as the grantors' right extended. The ground referred to in the two descriptions, is not identical ; it is quite apparent, that the one was intended to embrace something, which was not included in the other ; if it were otherwise, the two parts are repugnant, and the latter must be rejected ; on no reasonable construction of the language can it be said, that the extent of four hundred and eighty feet was to be diminished if the grantors had not a title to the whole length thereof ; but that the channel of the river was not to be the exterior boundary of the portion below that distance, if

their title did not extend so far as to the channel.   The tenants invoke the well  known principle,  " that whensoever the words of a deed have a double intendment, and one  standeth  with the law and right, and the other is wrongful  and  against  law, the intendment, which standeth with the law shall  be  taken ;" but this principle is not applicable to  the  question  before  us, for this is not a case of double intendment.   If the language used indicates clearly the intention  of the  parties, that inten- tion will stand, notwithstanding the law  may prevent its being carried into effect.   In the first description of  the  premises, is an absolute conveyance to Nathaniel Deering in fee ; the other contains in its terms  a  simple release of the  grantors'  right, title  and  interest,  in  language  expressive of  a  doubt of  the existence of title thereto ; it is true, that it  is a release of in- terest to the said " gore of flats," which  is a reference to  the whole  gore ;  but when  it is considered, that a specific section of  the gore had  been previously described with  clearness  and certainty, we do not doubt, that it was the intention only to sur- render whatever right  still  remained  in  them, not  before  de- scribed, to  the gore,  extending  to the channel of the river. This release was upon the same consideration, which had been expressed in reference to the ground first described ; but if the latter description was intended  to restrict  the  former, and to raise an use distinct from that therein named, it would seem that no consideration would be required.   It could not be sup- posed by the parties to the deed, that when a clause was added for the  purpose of abridging  the  rights  of  the  grantee, and limiting  instead  of enlarging  the  meaning  of  the  language before used, so that a less interest  would  pass, a consideration should move from the one deprived thereby of the  interest  to which he would otherwise be entitled ; but if it was intended, that something additional to what was before described, should be conveyed, it was proper, that  it  should be based upon a consideration.   The consideration in the last description being the same as that before mentioned, merely shows, that the con- sideration for  one was not distinct from that of  the other. It is evident, that the grantors regarded  their  title to the por-

tion of four hundred and eighty feet so perfect, that they were willing to convey it with covenants of seizin and warranty; whereas they did not intend that those covenants should apply to the part below. The habendum and the covenants in the deed are inconsistent with the proposition, that the conveyance was to the use of any other than Nathaniel Deering, his heirs and assigns; and although neither can control the premises, when the latter are free from doubt, but upon a question of intention of the parties in reference to the premises, the language used subsequently may be important and sometimes decisive.

If it had distinctly appeared from the deed, that Nathaniel Deering was the grantee for his own and the use of others, clearly designated, whose interest passed to the tenants, on the authority of the case of *Thacher* v. *Omans & al.* 3 Pick. 520, cited by their counsel, and the statute of uses of the 27 of Henry 8, chap. 10, the use and the title might have vested in the tenants; but it may well be doubted, whether the language relied upon by them shows any intention to raise a technical, legal use in any other, than the grantee named, and his heirs and assigns. The language of the premises in the latter description releases to Nathaniel Deering, or any person or persons, that may build, &c. *and for the use and benefit of the proprietors of the wharf that may be built as aforesaid.* It must have been known to all interested at the time of the execution of the indenture of May 31, 1784, and of the deed of June 26, 1790, that the distance of 480 feet below Milk Wharf extended further than to the line of low water, but all this distance was intended by the parties to both instruments to be covered with a wharf; and it was intended to extend so far towards the channel probably, that vessels might lie afloat at low water, near the lower extremity, as well as for other purposes; and there is nothing in the case manifesting, that it was in contemplation or expected, that the wharf would be carried beyond that limit. The space between its termination and the channel and that easterly thereof would certainly be highly beneficial, if not necessary to a profitable use of the wharf, after

its extension, for the accommodation of the owners of large ships, which might come to the wharf. This interval which was in fact a part of the public domain, but to which it was believed by the parties to the deed of June 26, 1790, that the owners of the ground between that and Milk Wharf had some, though indefinite right, was intended to remain open, and connected with the wharf, and under the control of its owners, that vessels might lie with safety, come to that part of the wharf, free from obstruction, and depart at any time, when pleasure or convenience might direct.

It appears, that as far as the wharf was expected to be built, the conveyance was intended to be absolute and in fee to the grantee named; below that it was restricted for the benefit of the wharf, showing the use for which, and not the persons for whom the release was intended. But this restriction, whatever it was, if applicable to private rights, became inoperative, as it had reference to a part of the public domain.

Another ground of defence is the manner in which the flats in controversy have been occupied since the year 1793, entitling the tenants, as they contend, to claim and hold them as their property, so far that they cannot be deprived thereof by the demandant.

By the colonial ordinance of 1641, which is a part of our law, " it is declared, that in all creeks, coves and other places about and upon salt water, where the sea ebbs and flows, the proprietor of the lands adjoining, shall have propriety to the low water mark, where the sea doth not ebb and flow above one hundred rods, and not more, wheresoever, it ebbs further. Provided, that such proprietor shall not by this liberty have power to stop or hinder the passage of boats or other vessels, in or through any sea, creeks or coves to other men's houses and lands." The owners of upland to which flats adjoin may sell the upland without the flats, or the flats without the upland. *Storer* v. *Freeman*, 6 Mass. R. 435. The propriety in flats, under the ordinance, is similar to that acquired in any other property, subject to the rights of the community mentioned in the proviso. So long as they remained open and

free from such erections as stop and hinder the passage of boats, &c. there is reserved for all, the right to pass freely to the lands and houses of others besides the owners of the flats; this includes the right of mooring their vessels thereon, and of discharging or taking in their cargoes. The owner of the flats has no power to take away or restrict this right, while the space is unoccupied. By the erection of permanent structures, such as wharves and piers, which he may lawfully make upon his own flats, he acquires thereby no exclusive right to the portion remaining open, so as to exclude persons from passing and repassing to and from the lands and houses of others. In common with him, the public have the same rights to the open space, which they had before, provided they do not interfere with his permanent erections. They may pass over the ground, occupied in connexion with his wharf, and for the accommodation of those, who come to the wharf, whenever their necessities or their inclinations induce them to go to others' lands or houses, and they have all the privileges of lying upon the flats, when they go or return from the lands of others, that they possessed before the erections.

The demandant has title to the premises claimed by virtue of the documents offered in evidence. The indenture of 1784 gave no title to a space wider than that therein described; he has long been the owner of Milk Wharf, which is accessible from the ocean through a passage over the flats; in the enjoyment of the benefits of Milk Wharf, he and his tenants have used the passage without being subject to any wharfage or dockage from the tenants. The dockage which has been claimed and received by the tenants, from those, who occupied the flats, easterly of Long Wharf, has been for such occupation in connexion with the wharf, to which they came for the benefit which it afforded, and not of those who were passing to and from the land of others. The persons, who thus occupied the flats and paid dockage to the tenants, were in the enjoyment of a right, of which the demandant could neither deprive the owners of the vessels or of the wharf; the former possessed the privilege by the law, which our ancestors brought with

them, and which the ordinance did not take away, but expressly reserved to them. The owners of the wharf received the compensation to which they were entitled, from those who lawfully came to it, to enjoy the use for which it was designed. The demandant was deprived of none of his rights, by this enjoyment by others, and had no power to restrain them, and he lost nothing of his legal title to possession by suffering that which he had not the effectual means to prevent.

*The default must stand.*