# OHIO
# CIRCUIT COURT REPORTS.

## NEW SERIES—VOLUME XXI.

CASES ARGUED AND DETERMINED IN THE CIRCUIT
COURTS AND COURTS OF APPEALS OF OHIO.

### LITTORAL RIGHTS ON LAKE ERIE.

Court of Appeals for Cuyahoga County.

STATE OF OHIO v. THE CLEVELAND-PITTSBURG RAILWAY
COMPANY ET AL.

Decided, December 7, 1914.

*Riparian Owners on Lake Front—May Wharf Out and Make Land to
the Line of Navigation—Title of the State in Lake Waters and the
Soil Thereunder—Government Control of Navigation and Fishery—
Prevalence of the Common Law in Ohio—Review of the Holdings
of Courts of the Various States as to Littoral Rights.*

1. The state of Ohio holds the title to the soil under Lake Erie, within
   its boundaries, as it does to the waters thereof over said soil, in
   trust, however, for the purposes of navigation and fishing.
2. The United States Government has the paramount right to fix the
   line of navigation in said lake, but within that line so fixed by it
   and between it and the shore the state has the right to regulate
   navigation and fishing, so long as it does nothing to conflict with
   the regulations of the general government, or the access of the
   riparian owner to navigable water. .
3. Until the state otherwise determines by appropriate legislation, it
   will be held to have acquiesced in the line of navigation fixed by
   the United States, and the owner of land fronting on Lake Erie

has the right to wharf out and make land to the line of navigability so fixed, and this right pertains to every foot of the shore property.

*T. S. Hogan,* Attorney-General, and *R. M. Morgan,* for plaintiff in error.

*Squire, Sanders & Dempsey* and *S. H. West,* contra.

WINCH, P. J.; MEALS, J., and GRANT, J., concur.

Error to the court of common pleas.

This is a proceeding to review the judgment of the common pleas court in dismissing an action brought by the state to enjoin the defendant from further filling in the shallow waters of Lake Erie on which their lands front and to require them to remove material already filled in and restore the waters to their former condition at the original shore line.

From the record it appears that defendants in error own various parcels of land having a frontage of about 1400 feet on the shore of Lake Erie, just west of the government pier on the west of the Cuyahoga river, said frontage being about one-third of the water front in the west basin of the artificial harbor of Cleveland created by the construction of the government breakwater.

A portion of the shallow waters in front of the defendants' lands has been filled in by them. In 1910 the United States Government, acting through its War Department, established a harbor line about 900 feet out from the shore. Beyond that harbor line and between it and the breakwater built by the government, is a basin or waterway with water from 22 to 24 feet in depth, which is requisite to afford wharfage to the vessels engaged in commercial navigation on the Great Lakes.

The work of filling in the shallow waters of Cleveland harbor and wharfing out to navigable water has been going on for many years. Millions of dollars have been expended on portions of the filled lands and upon them have been erected expensive devices for the unloading and transshipment of iron ore.

The railroads owning lake frontage, the city of Cleveland and various manufacturing establishments and other littoral proprietors have made extensive fills and wharfs.

The theory of the state in the prosecution of this suit is that the general common law has always prevailed in Ohio; that under the rules of the common law, a littoral proprietor on Lake Erie has no right to wharf or fill out beyond the shore line; that the title of the state of Ohio to the waters of Lake Erie and the soil beneath is that of a real proprietor, subject only to the superior control of Congress under the Federal Constitution and subject to the public easements of navigation and fishery.

The defendants admit that the title to the subaqueous land is in the state of Ohio, not, however, as a private owner or absolute proprietor, but in trust for the protection of navigation and fishery. They claim that the so-called common law rule relied upon by the state is obsolete and does not prevail in Ohio, its courts having so decided. They also claim that the establishment of a harbor line by the federal government defines the line of navigation and that waters lying between the upland and the line of navigation are not used, nor capable of being used, for either navigation or fishery; that the establishing of a harbor line creates a right in the riparian owner to move forward to that line, and that, therefore, the filling in complained of was an exercise of the property right incident to littoral or riparian ownership and is lawful.

We do not think that the claim that the shallow waters now being filled in are not capable of any use for navigation or fishery is sustained by any evidence, but it is agreed by all parties that there has been no state legislation fixing a harbor line or regulating harbor or fishing facilities in the Cleveland harbor.

The state seems to assume that the "general common law," by that meaning the common law of England from the earliest date down to the organization of the state of Ohio, and including all the decisions of the courts of England upon matters not regulated by statute, has always prevailed in this state, whether suitable to our institutions or not.

That is a mistake, as has frequently been held.

In the first volume of reported cases in this state it is said:

"It has been repeatedly determined by the courts of this state that they will adopt the principles of the common law as the rules of decision, so far only as those principles are adapted to

our circumstances, state of society, and form of government."
*Lessee of Lindsley* v. *Coats,* 1 Ohio, 243, 245.

The spirit of that decision was followed in the case of *Carey*
v. *Commissioners of Montgomery County,* 19 Ohio, 245, see page
281, and it was said by the "old Roman," Judge Thurman, in
the case of *Bloom* v. *Richards,* 2 O. S., 387:

"The English common law, so far as it is *reasonable in itself,
suitable to the condition and business of our people,* and con-
sistent with the letter and spirit of our federal and state con-
stitutions and statutes, has been and is followed by our courts,
and may be said to constitute a part of the common law of Ohio.
But where it has been found wanting in either of these requisites,
our courts have not hesitated to modify it to suit our circum-
stances, or, if necessary, to wholly depart from it."

Another great jurist of this state, Judge Ranney, in the case of
*Railroad Co.* v. *Keary,* 3 O. S., 202, used the following language:

"We profess to administer the common law of England, in so
far as its principles are not inconsistent with the agencies and
spirit of our own institutions, or opposed to the settled habits,
or customs, and policy of the people of this state, thereby ren-
dering it inapplicable to our situation and circumstances."

Then stating his view of the law applicable to the case in hand
and that it was very confidently claimed that that view was at
variance with all the adjudged cases in England and in this
country, he said:

"We entertain the highest respect for these courts, and their
undivided opinion upon any question arising upon the principles
of the common law would cause us to hesitate long before we dif-
fered from them. But even upon such a question, we should be
compelled to follow the dictates of our own understandings; and
the more especially should we feel at perfect liberty to do so,
when they did not profess to base their decisions upon any
settled principle of law, but undertook to declare a new rule for
their action."

Many cases might be cited in which the Supreme Court of this
state has found the common law of England inapplicable to the
customs, business and condition of our people and refused to ap-

ply it.  A notable case of that kind, involving a matter kindred to the subject here to be considered; is *Lembeck* v. *Nye,* 47 O. S., 336, where it was held that a non-navigable inland lake is the subject of private ownership and an owner of adjacent lands whose deed makes the lake one of his boundaries, takes to the center of the lake.  Commenting upon the fact that in some of the states and in England, the rule is to limit the operation of the conveyance to the water edge and that the numerical weight of authority supports that rule, Judge Bradbury says:

"In this conflict of authority we are at liberty to adopt such rule on the subject as best comports with the presumed intention of the parties, or sound public policy, and the analogy of the rules in  force  in  the  state  respecting  boundaries  upon  running streams."

The rule as to running streams was laid down in *Gavit* v. *Chambers,* 3 Ohio, 495, and if there is any analogy between that case and the instant case, it is in favor of the defendants.

The next assumption of counsel for the state is that under the rules of the common law a littoral proprietor on Lake Erie has no right to wharf out or fill in beyond the shoreline.

Such is not the law in England today.  See *Duke of Buccleuch* v. *Metropolitan Board of Works,* L. R., 5 H. of L., 418; *Lyon* v. *Fishmonger Company,* L R., 1 App. Cases, 662; *Attorney-General* v. *Wemyss,* L. R., 13 App. Cases, 192; *North Shore Railway Co.* v. *Pion,* L. R., 14 App. Cases, 612.

That it was once the law of England may be conceded, but when and under what circumstances and by whom was it so declared to be the law?

On this subject we have recourse to a recent book by Frederick R. Coudert, an eminent lawyer of the New York bar, who was counsel in the Brookhaven case which will hereafter be cited. The title of this book is "Certainty and Justice" and the eighth chapter of it is entitled "Perversion of Precedent—stare Decisis —History Misinterpreted."  It is upon the subject here in hand and shows a thorough knowledge of the subject, citing the authorities.

We quote as follows:

''The theory of the kingly ownership of the foreshore was invented by an ingenious Crown lawyer, one Thomas Diggs, in the reign of Elizabeth. His claim was that the foreshore belonged to the Crown, not as other royal property, but as part of the royal prerogative, and he supported it in a learned thesis on the subject, based upon an assumption of a state of facts of which there is no proof, and the reverse of which almost certainly exists. Before the reign of Queen Elizabeth the true presumption of fact with regard to the ownership of the foreshore should have been the exact reverse, namely, that it was in the riparian owner rather than in the Crown. It appears that during the reigns of Elizabeth and of James I, in a number of cases, the Crown claim to foreshore ownership was made by astute lawyers, filled with zeal to enlarge the royal jurisdiction; but all these cases seem to have been unsuccessful until the famous case of *Attorney-General* v. *Philpot,* in 1628, which, we may say in passing, is mentioned in the dissenting opinion in the Brookhaven case as the leading English case establishing that doctrine. That case does not appear to be reported, but Mr. Moore has found the manuscript record, and gives it *in extenso* in his exhaustive work (History and Law of the Foreshore and Seashore). It is extraordinary that it should be the foundation of a rule of property law, which until 1907 was the law in the state of New York, when we reflect that the case was decided by judges, some of whom sat in the famous Ship Money case, and upon whom history has placed a heavy load of obloquy. The decision was apparently procured, as the Ship Money judgment had been, by the personal pressure of Charles I for the purpose of obtaining for the Crown properties and revenues to which it had no just title. The claim, says Mr. Moore, 'was founded in untruth and injustice, and the too great insistence upon it by Charles I unquestionably was one of the causes of the great Revolution.

''Sir Thomas Townsend, writing to a friend as to the Philpot case, intimates that it will be properly disposed of 'when some of the barons have received directions from the King.' The case itself seems to have been a moot case, contrived by the Stuart monarch for the purpose of obtaining a decision which might bring him needed revenues. The Crown lawyers raised the question by making a lease of a piece of foreshore to one Cornelius Vanderbilt, with a view to establishing legal title by an action.  *  *  *

''The 'Grand Remonstrance' of 1641 is almost as noteworthy a landmark in the history of English liberty and constitutional law as the Grand Charter itself, yet how many judges who have learnedly considered these questions have had in mind the Twen-

ty-sixth Article of that memorable document, charging the King with 'taking away of men's rights under color of the King's title to land between high and low-water mark?'

"After the downfall of the Stuart tyranny the claim seems to have been abandoned, or at least not pressed for many years, and the judgment in the Philpot case itself was apparently never executed, owing doubtless to the advent of the Revolution. There were, as there had been before, numerous cases relating to interference with the *jus publicum*, but we must wait many years before we find another precedent for the Stuart doctrine of *jus privatum*. It has always been admitted that the *jus publicum* was inalienable, and in examining the early cases care must be taken to distinguish between the two."

*Johnson* v. *Barret*, 3 Aleyn K. B. Reports, 10, decided in 1647, generally cited as upholding the doctrine of the Philpot case, upon examination of the subsequent history of the litigation, appears to have concerned an obstruction to navigation, or nuisance.

Sir Mathew Hale, who died in 1676, wrote a treatise, De Portibus Maris, which is found in Hargreave's Law Tracts, and on page 85 is found the following much quoted statement:

"Indeed, where the soil is the King's the building below the high-water mark is a purpresture, an enroachment, and intrusion upon the King's soil, which he may either demolish or seize or arent at his pleasure; but it is not *ipso facto* a common nuisance, unless, indeed, it be a damage to the port and navigation."

Lord Hale is the weightiest authority in favor of the common law doctrine contended for by the state, but he does not seem to have believed that historically the King was the owner of the foreshore, but only that there was a presumption of law to that effect in the absence of proof to the contrary.

In 1795 the case of *Attorney-General* v. *Richards* (2 Anstruther, 602), was decided. The action was to abate a wharf and the court held that it was a purpresture and that it was immaterial whether or not it was an actual nuisance. Regarding the Philpot case the court say:

"It is objected that this case was in the time of Charles I; but it must be remembered that Lord Hale determined some of them, and approved the rest."

*Parmenter* v. *Gibbs* (10 Price, 412), decided by the House of Lords in 1822, adopts the law as laid down in the Richards case.

Now these are the authorities which fixed the law in England, until it was modified by the recent decisions to which reference has been made.

There is no decision of the state of Ohio adopting the doctrine of these cases, and it has been departed from repeatedly by the courts of the various states of the Union and modified by legislation in some of them.

In New York state we find the question finally settled by the case of *Town of Brookhaven* v. *Smith,* 188 N. Y., 74, decided in 1907. The first paragraph of the syllabus of that case is as follows:

"A riparian owner whose land is bounded by navigable waters has the right of access thereto from the front of his lot, and such right includes the construction of a pier on the land under water, beyond high-water mark, for his own use or for the use of the public, subject to such general rules and regulations as Congress or the state Legislature may prescribe for the protection of the rights of the public, although under the common law of England such structure is regarded as a purpresture or an unlawful encroachment upon the rights of the sovereign, and subject to removal at his pleasure. The fact that in the absence of statutory enactment the courts of this state are ordinarily bound by the rules of the common law does not compel them to incorporate into our system of jurisprudence principles which are inapplicable to our circumstances, and which are inconsistent with what a just consideration of those circumstances demand. Where no vested rights are actually conerned, the application of common-law rules depends upon the extent to which they are reasonable and in accord with public policy and sentiment; and in a state like this, with its numerous large navigable bodies of water, in bays, rivers and inland lakes, and where so many riparian owners have made their easement or right of access practical and available by the construction of docks, piers and wharves, and have done so without interference by the state when superior public rights have not been obstructed, such a rule would be without justification and will not, therefore, be established by the courts."

Judge Gray, who wrote the majority opinion in that case, to show that the common law of England was not applicable to the

circumstances of the people of New York, uses the following language:

"We have but to consider the position of Great Britain, as an island, with short rivers, navigable only as far as the tide flows and ebbs, and a reason for the rigidity of the rule early asserted as to the rights attaching to riparian ownership may appear, in the apprehension of the 'straightening of the port by building too far into the water.' (From Hale's de Portibus Maris.) Our position is different, physically and governmentally.

"The *jus privatum* of the Crown, by which the English king was deemed to own the soil of the sea and of navigable rivers, in his own right, rather than as a sovereign holding it in trust for his people, however applicable to the conditions in Great Britain, were totally inapplicable to the situation of the colonists of this country. In Gould on Waters, the author remarks, as to this, that 'there is no evidence that the *jus privatum* ' * * * was ever asserted in the colony as the right of the Crown, or that it has, until recently, been claimed by the states; but there is, on the contrary, in my opinion, the strongest evidence that this right has been abandoned to the proprietors of the land from the first settlement of the province and exercised by them to the present day, so as to have become a common right and thus the common law.' (3d ed., Sec. 32.)

"I may observe, in passing, that in England the common law rule, which left the riparian owner without any remedy, when his right of access was destroyed by public works, has been modified, within recent years. (See *Buccleuch* v. *Metrop. B'd of Works*, L. R. (5 Eng & Ir. App., 418.)

"It is a matter of general observation, of which judicial notice. may wisely be taken, that riparian owners everywhere upon the numerous navigable bodies of waters within the territorial limits of this state have made their easement, or right of access, practical and available by the construction of docks, piers, or wharfs and have done so without interference by the state, where superior public rights have not been obstructed. These interests must be very large and if we shall hold with the English common-law doctrine, that they are purprestures, or unlawful encroachments upon the proprietary rights of the state, as would follow, if we affirm this judgment, and that they are removable at pleasure, it would result in causing a very grave loss. Such a decision would be to ignore what has been believed to be a common right, within numerous adjudications of our court."

For much the same reasons it was held in Connecticut that though the title of a riparian owner terminates at ordinary

high-water mark, he has the exclusive right to wharf out below the low water mark to navigable waters, or to dig channels from his uplands to navigable waters, so long as he does not interfere with free navigation. *Prior* v. *Schwartz,* 62 Conn., 132.

In this connection it is well to advert to a suggestion made by the state in the trial of this case, upon which it offered evidence which was rejected, that the defendants could secure access to deep water more cheaply by dredging in to their own shore line than by filling in the territory between the shore line and the harbor line. This seems to yield the whole question here involved in favor of the defendants. If the state owns the subaqueous soil as a proprietor, what difference is there between the trespass of digging a hole in it, or piling dirt on top of it?

Of course there is no difference, and the real question remains, does either digging a channel or wharfing out interfere with navigation or fishery, as regulated by the state?

The right of the riparian owner to wharf out to navigable waters in New Hampshire is placed upon the grounds of usage or custom. *Clement* v. *Burns,* 43 N. H., 609; *Concord Co.* v. *Robertson,* 66 N. H., 1.

The right to wharf out in Maine was established by colonial ordinance in 1641 (*Deering* v. *Proprietor's Long Wharf,* 25 Me., 51; *State* v. *Wilson,* 42 Me., 9); and in Massachusetts this early colonial statute, later repealed but considered as part of the common law, gave the riparian owner the right to wharf out 100 rods beyond high water mark. *Bradford* v. *McQuestion,* 182 Mass., 80.

In Rhode Island this right, from the earliest time, was considered inseparable from the ownership of the upland. *Providence Steam Engine Co.* v. *Providence, etc., Steamship Co.,* 12 R. I., 348; *Folsom* v. *Freeborn,* 13 R. I., 200.

In New Jersey the courts hold that by custom the shore owner can reclaim the land between high and low water marks, but such privilege is a mere license which the Legislature may revoke at any time, *before execution. Bell* v. *Gough,* 23 N. J. Law, 614; *Stevens* v. *R.. R. Co.,* 34 N. J. Law, 532; *Heiney* v. *Nolan,* 75 N. J. Law, 397.

The right to wharf out to the limit of navigability is recognized in Delaware. *H. & H. Co.* v. *Parschall,* 6 Del. Ch., 435.

In Maryland the matter is regulated by statute (*Gautier* v. *Baltimore,* 53 Md., 422; *Baltimore* v. *Steamboat Co.,* 104 Md., 485) ; and the same is true in Florida. *Alden* v. *Pinnney,* 12 Fla. 348; *Sullivan* v. *Mereno,* 19 Fla., 200.

In North Carolina, by statute, a riparian owner has the exclusive right to a grant from the state of the right to wharf out to the line of navigation (*Gregory* v. *Forbes,* 96 N. C., 77) ; and without any such grant from the state he has the same right, subject, however, to such general regulation as the Legislature may prescribe for the protection of the public's interests (*Bond* v. *Wood,* 107 N. C., 139). This is also true in Georgia. *Mayor, etc., of Savannah* v. *Georgia,* 4 Ga., 26.

The right to wharf out in Alabama is based by its courts upon immemorial usage and is recognized by statute. *Turner* v. *City of Mobile,* 135 Ala., 73.

The act of the Republic of Texas regulating such matters has been construed to give the riparian owner the right to wharf out, the court basing this conclusion upon the necessity of the case, in order to make wharves useful. *Galveston* v. *Mennard,* 23 Texas, 349.

The states on the Pacific slope have adopted the old English rule (*San Francisco Sav. Union* v. *R. G. R. Petroleum Co.,* 144 Cal., 134; *State* v. *Sturtevant,* 76 Wash., 158; *Pacific Elevator Co.* v. *Portland,* 65 Or., 349) ; and the United States Supreme Court has administered the law accordingly, in those states, holding that the question of title to the foreshore and soil under navigable waters depends upon the law of the state where the question arises. *Shively* v. *Bowlby,* 152 U. S., 1.

On the Great Lakes we have seen what is the law of New York (*Brookhaven* v. *Smith,* 188 N. Y., 74), and we apprehend that decision is applicable to Lake Ontario; see also *Thousand Islands Steamboat Co.* v. *Visger,* 179 N. Y., 206.

In Pennsylvania the rights of the riparian proprietor are said to end at the water's edge, in the absence of legislative authority extending them. *Tinicum Fishing Co.* v. *Carter,* 61 Pa. St., 21.

In Michigan we find the case of *Lincoln* v. *Davis,* 53 Mich., 375, where it is said:

"In England, where the common law had its origin, there were no great inland seas, such as our great lakes, and consequently no precedent can be found in the jurisprudence of that country which determines the applicability of the common law doctrine of riparian rights to the question under consideration.
*   *   *

"The paramount rights of the public to be preserved are those of navigation and fishery, and this is best accomplished by limiting the grants of lands bordering on the great lakes to low-water mark. It does not follow, however, that the owner of lands thus bounded has no right to the use of the water or soil beneath it. It is well settled in this country that where the law is that the owner is limited by either high or low-water mark, he has the right to construct warehouses, wharves or piers in the water in front of his land, in aid of and not obstructing navigation." Citing many cases.

Thomas M. Cooley, Chief Justice of the Supreme Court of Michigan, sat in this case and concurred in the judgment. In his work on Constitutional Limitations, 5th Edition, page 675, is a note which reads as follows:

"In the recent case of *Railway Co.* v. *Renick,* 102 U. S., 180, it is decided expressly that the land under the water in front of a riparian proprietor and beyond the line of private ownership, can not be taken and appropriated to a public purpose without making compensation to the riparian proprietor. *This is a very sensible and just decision.*"

In Wisconsin it has been held that "riparian rights proper rest upon the title to the bank of the water, and are the same whether the riparian owner owns the soil under the water or not," and that such riparian owner "unless prohibited by local law, has a right to construct in shoal water, in front of his land, proper wharves or piers, in aid of navigation, and at his peril of obstructing navigation, through the water far enough to reach actually navigable waters." *Diedrich* v. *Railway Co.,* 42 Wis., 248.

To the same effect are the decisions of the state of Minnesota, and the reasons for so holding are given at length and seem persuasive. It would be profitable to quote from the decisions of that state, but time forbids. They are as follows: *Union Depot*

*Co.* v. *Brunswick,* 31 Minn., 297; *Lake Superior Land Co.* v. *Emerson,* 38 Minn., 406; *Miller* v. *Mendenhall,* 43 Minn., 95; *Hanford* v. *Railroad Co.,* 43 Minn., 104.

In Illinois the old common law rule prevails. *Revell* v. *People,* 177 Ill., 468; *Commissioners* v. *Fahrney,* 250 Ill., 256.

The decisions of the Supreme Court of the United States are not in entire harmony. In *Yates* v. *Milwaukee,* 10 Wall., 497, Mr. Justice Miller said:

"Whether the title of the owner of such a lot extends beyond the dry land or not, he is certainly entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream; and among those rights are access to the navigable part of the river, from the front of his lot, the right to make a landing, wharf or pier for his own use or for the use of the public, subject to such general rules and regulations as the Legislature may see proper to impose for the protection of the rights of the public, whatever those may be. * * * This riparian right is property, and is valuable, and, though it must be enjoyed in due subjection to the rights of the public, it can not be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation."

In *Shively* v. *Bowlby, supra,* Mr. Justice Gray adopts Lord Hale's conclusion, and this authority fully sustains the claim of the state in this case, but the decision merely administers the law of Oregon, conceding that the rule is different in some of the states.

In the later case of *Scranton* v. *Wheeler,* 179 U. S., 141, the court thus stated the law:

"If the riparian owner can not enjoy access to navigability because of the improvement of navigation by the construction, away from the shore line, of works in a public navigable river or water, and if such right of access ceases alone for that reason to be of value, there is not, within the meaning of the Constitution, a taking of private property for public use, but only a consequential injury to a right which must be enjoyed, as was said in the Yates case, in due subjection to the rights of the public—an injury resulting incidentally from the exercise of a governmental power for the benefit of the general public, and from

which no duty arises to make or secure compensation to the riparian owner. The riparian owner acquired the right of access to navigability subject to the contingency that such right might become valueless in consequence of the erection under competent authority of structures on the submerged lands in front of his property for the purpose of improving navigation.''

This is a declaration that the riparian owner holds his right to reach the line of navigation subject to the state's right to regulate navigation and fix the line; no question of ownership by the state of the foreshore was necessarily involved.

We now come to the decisions of Ohio, having in mind that there has been no legislation upon the subject by the state (except, perhaps, the act of March 29, 1867, 64 O. L., 87, repealed April 30, 1868, 65 O. L., 115, and unless the act of May 10, 1910, 101 O. L., 236, is a recognition of the rule that ''made or submerged land'' in front of a riparian owner's property belongs to him), and also having in mind that the riparian owner's rights have been established as to navigable rivers (*Gavit* v. *Chambers*, 3 Ohio, 496), and as to non-navigable inland lakes (*Lembeck* v. *Nye*, 47 O. S., 336).

The case of *Sloan* v. *Biemiller*, 34 O. S., 492, decided in 1878, involved only the right of fishing in Lake Erie and its bays, and the court held that such right is not limited to the proprietors of the shores, but is as public as if they were subject to the ebb and flow of the tide. This holding was based upon the proposition that the rule of the English common law that the owners of land situate on the banks of non-tidal streams, though navigable in fact, are owners of the beds of the rivers to the middle of the stream, is not applicable to the owners of land bounding on Lake Erie. The fourth paragraph of the syllabus of the case is as follows:

''Where no question arises in regard to the right of a riparian owner to build out beyond his strict boundary line, for the purpose of affording such convenient wharves and landing places as do not obstruct navigation, the boundary of land, in a conveyance calling for Lake Erie and Sandusky bay, extends to the line at which the water usually stands when free from disturbing causes.''

Thus we see that the Sloan case expressly reserves the question here involved, where the question does arise as to the right of a riparian owner to build out beyond his strict boundary line.

The opinion in the case, written by Judge White, puts it this way:

"We are not required in this case to consider any question in regard to the right of a riparian owner to build out beyond his strict boundary line, for the purpose of affording such convenient wharves and landing places in aid of commerce as do not obstruct navigation. It was held in *Dutton* v. *Strong* that these rights of the riparian owner apply to the lakes as well as to tide waters (1 Black., 23). See also *Austin* v. *Rutland R. R. Co., supra,* 25 Vt., 215."

Here is a clear intimation that if the question we now have before us had then been before the Supreme Court, it would have followed the rule laid down in the cases cited. Let us therefore examine said cases.

In *Dutton* v. *Strong,* at page 31, it is said:

"Bridge piers and landing places, as well as wharves and permanent piers, are frequently constructed by the riparian proprietor on the shores of navigable rivers, bays, and arms of the sea, as well as on the lakes; and where they conform to the regulations of the state, and do not extend below low water mark, it has never been held that they were a nuisance, unless it appeared that they were an obstruction to the paramount right of navigation. Whether a nuisance or not is a question of fact; and where they are confined to the shore, no positive law or regulation was violated in their erection, the presumption is that they are not an obstruction, and he who alleges the contrary must prove it. Wharves, quays, piers and landing-places, for the loading and unloading of vessels were constructed in the navigable waters of the Atlantic states by riparian proprietors at a very early period in colonial times; and, in point of fact, the right to build such erections, subject to the limitations before mentioned, has been claimed and exercised by the owner of the adjacent land from the first settlement of the country to the present time. (Ang. on Tide Wat., p. 196.)

"Our ancestors, when they immigrated here, undoubtedly brought the common law with them, as part of their inheritance; but they soon found it indispensable, in order to secure these conveniences, to sanction the appropriation of the soil between high

and low water mark to the accomplishment of these objects. Different states adopted different regulations upon the subject; and, in some, the right of the riparian proprietor rests upon immemorial local usage. No reason is perceived why the same general principle should not be applicable to the lakes, although those waters are not affected by ebb and flow of the tide; and, consequently, the terms 'high and low water mark,' are not strictly applicable. But the lakes are not navigable, in any proper sense, at least in certain places, for a considerable distance from the margin of the water. Wherever the water of the shore, so to speak, is too shoal to be navigable, there is the same necessity for such erection as in the bays and arms of the sea; and where that necessity exists, it is difficult to see any reason for denying to the adjacent owner the right to supply it; but the right must be understood as terminating at the point of navigability, where the necessity for such erections ordinarily ceases.''

To the same effect is the Vermont case.

The next case in Ohio is *Hogg* v. *Beerman,* 41 O. S., 81, where it was held that land covered by the water of a navigable landlocked bay, or harbor, connected with Lake Erie, may be held by private ownership, subject to the public rights of navigation and fishery.

In coming to this conclusion the court quotes with approval the case of *Lorman* v. *Benson,* 8 Mich., 32, where Judge Campbell, speaking of the Detroit river, said:

''Applying the principles of the common law to the tideless stream in question, we do not conceive what public interests would be subserved by placing it on the footing of tide-waters, when the rules applying to public fresh water streams provide amply for every common easement. The right of navigation, to which all others are subservient, is in no way injured or abridged by this holding, and the necessities of wharves, and other conveniences, which could not be made available at all in such a stream as this, unless owned by the riparian proprietor (because not accessible except over his grounds), would be an inducement to modify the common law, were it otherwise, rather than change it as it is now.    *    *    *    And we have no difficulty in holding that the plaintiff is entitled to every beneficial use of the property in question which can be exercised with a due regard to the common easement. The cutting of ice is the exercise of a valuable privilege, in securing that which has become stationary on the

freehold, and we conceive of no reason which would justify a denial of it.''

The Detroit river is but a part of the Great Lakes and the language quoted is given for the purpose of showing the interdependence of the rights of navigation and wharfage.

We come now to the first case squarely involving the questions here at issue. It is the case of *White* v. *Cleveland,* 14 C.C.(N. S.), 369, decided by the Circuit Court of Cuyahoga County in 1911 and affirmed by the Supreme Court without report, 87 O. S., 482.

The cases considered by the circuit court involved the title to made land in the Cleveland harbor east of the government pier at the mouth of the Cuyahoga river, while the case now before us involves the title to lands similarly situated west of that river. In 1872 the city of Cleveland condemned the premises in question fronting on the lake for park purposes. Thereafter it filled in and made land and built piers in front of this park, called Lake View Park, out to the line of navigation established by the United States Government. Taking advantage of certain enabling statutes passed for its benefit it was proposing to appropriate the fee in this made land for the purpose of acquiring the reversionary rights of the owners from whom it had appropriated, in order to have a fee simple title so that it could convey part of the made land, as well as part of the upland of the park, to certain railroads for depot purposes and lease other parts and piers to a steamboat company for wharf purposes.

To enjoin the appropriation proceedings and the lease to the steamboat company the suits in question were brought.

The whole contention of the reversioners was that, subject to park uses, they were entitled to the right to wharf out, as riparian proprietors. The city claimed the same right as proprietor for park uses. The steamboat company's lease depended upon the validity of the city's right to wharf out, as well as the validity of the enabling legislation referred to. The whole case depended upon the right to wharf out, and required the settlement of that question before other matters should be considered.

Because of the difficulty of elucidation of the other questions in the case, for the sake of brevity alone, and because the common

pleas judge who first tried the case had fully covered the point, his opinion being published (*White* v. *Cleveland*, 12 N.P.[N.S.], 225), the question now under consideration was shortly disposed of as follows:

"The claim of plaintiffs in all four suits is that by the appropriation proceedings of 1872, the city acquired only an easement for park purposes in Lake View Park, including the uplands; that by appropriating an easement for ·park purposes in the shore, it at the same time appropriated for park purposes the riparian rights which were appurtenant to the shore; that these riparian rights included the right to wharf out, to make land to the limit of navigability, unless prevented by the state; that the city appropriated this right for park purposes; and having made land by the exercise of this riparian right without interference by the state, the made land was affected by the same easement for park purposes with which the upland was affected; that the piers are but a portion of the made land. Having the right to fill out the entire land to the harbor line, unless prevented by the state, the city had the right to fill out as much of it as it desired for this purpose, and its rights were neither lessened nor increased by the fact that it did not fill it out uniformly, but made part into piers and left part water.

"For the reasons and upon the authorities cited by counsel for plaintiff in his brief. we conclude that the above recited claims are well founded."

It is true that the state of Ohio was not a party to that case, so the question there determined can not be considered *res adjudicata* as to it, but it furnishes the rule of law applicable to this case, as determined by the courts of this state and invokes the rule of *stare decisis,* for most of the vast improvements started by defendant in this case, involving the expenditure of great sums of money, have been made since and in reliance upon the decision in the White case. We consider the White case lays down a rule of property upon which the defendants had a right to rely.

Having considered the trend of authority upon the subject, let us now view the matter in the light of reason.

Between the shore of Lake Erie and navigable waters in it is a stretch of shallow water not suitable for navigation. The state of Ohio owns all the waters of Lake Erie and the soil under it

within its boundary, but charged with the trust of holding the same for all the people to be used in common by them for the purposes of navigation and fishing.

The riparian proprietor, whose title stops at the shore line, owns in fee to that line. There can be no passing from the water upon his land without his consent, yet he, as one of the public, at least, if not as a riparian proprietor, has the right to pass from his land upon the water for navigation or fishing.

The shallow water referred to is an obstacle to navigation in that it prevents the landing of vessels. There can be no commerce by ships without landing places, and the construction of landing places is manifestly in aid of navigation. Wharfs are as necessary to commerce by water as depots are to commerce on land by rail—more necessary, in fact, as was pointed out in the White case.

The state, owning the subaqueous land, can erect no dock or wharf in front of the riparian proprietor which will interfere with his access to the water. By the nature of his position, fronting upon the water, he has the right of access to it as he has to a street or highway in front of the land upon which his property may front. These are valuable rights which should not be taken from him without compensation.

On the other hand his immemorial right has always been to prevent the public coming upon his private property without his consent, either from a highway or the water.

How are these rights of the state, charged with a trust for the people for navigation and fishing, to be reconciled with the private rights of the riparian owner?

Manifestly the state, in subordination to the authority of the general government over such matters, can fix the line of navigation, beyond which the riparian proprietor shall not pass with any devices intended to aid him in reaching navigable waters, but it should not forbid him to construct any aids to navigation. Piers, docks and wharfs, no matter how constructed, whether of piling, stone, concrete or filled in earth, are assuredly aids to navigation. They are then in aid of the trust with which the state is charged and not in derogation of it.

Such being the case, common sense dictates that they should not be forbidden. Generally, they have not been forbidden, as we have seen by the authorities cited.

Custom in this state, as shown by the evidence and within the judicial knowledge of this court, has recognized this right of the riparian owner to wharf out to the line of navigability in the waters of Lake Erie.

For over one hundred years the people of this state, through its Legislature, has in nowise interfered with this practice of riparian owners.

The federal government has recognized the right by fixing a line of navigation and granting licenses to fill in to that line, without prejudice, however, to the rights of the state.

Upon reason and authority, therefore, we conclude as follows:

1. The state of Ohio holds the title to the soil under Lake Erie within its boundaries as it does to the waters thereof over said soil, in trust, however, for the purposes of navigation and fishing.

2. The United States Government has the paramount right to fix the line of navigation in said lake, but within that line so fixed by it and between it and the shore, the state has the right to regulate navigation and fishing, so long as it does nothing to conflict with the regulations of the general government, or the access of the riparian owner to navigable water.

3. Until the state otherwise determines by appropriate legislation, it will be held to have acquiesced in the line of navigation fixed by the United States, and the owner of land fronting on Lake Erie has the right to wharf out and make land to the line of navigability so fixed, and this right pertains to every foot of the shore property.

In conclusion it may be well to state that we have declared the law as we have found it, without consideration of those questions of public policy urged by the Attorney-General, which should more properly be addressed to the Legislature.

If it is wise for the state or the municipalities upon the shore of Lake Erie to acquire, construct, and control and perhaps lease, public docks and wharves upon the lake front, the matter can be properly legislated upon, having due regard to the rights

of the shore owners, taking from them no property rights without due compensation therefor, pursuant to the mandate of the Constitution and consonant with common honesty.

The judgment is affirmed.