# CASES

IN THE

# SUPREME JUDICIAL COURT

IN

## THE COUNTY OF PENOBSCOT, JUNE TERM, 1831.

LAPISH *vs.* THE PRESIDENT &c. OF THE BANGOR BANK.

The colonial ordinance of 1641, extending the title of riparian proprietors to low water mark, though originally limited to the *Plymouth* colony, is part of the common law of *Maine;* and is applicable wherever the tide ebbs and flows, though it be fresh water, thrown back by the influx of the sea.

Where the grantee is bounded by "high water mark," he is not a riparian proprietor, and therefore not entitled to the benefit of the ordinance. *Aliter* where he is bounded by "the stream."

The settlers in *Bangor,* who, by the resolve of *March* 5, 1801, were to be quieted in their possessions of a hundred acres each, and whose lands adjoined the river, are entitled to the flats lying in front of their respective lots, notwithstanding the full complement of a hundred acres each was laid out to them upon the upland.

THIS was a writ of entry to recover an undivided portion of an acre of land at *Budge's* point in *Bangor,* adjoining *Penobscot* river, and extending to low water mark; in which the demandant counted on his own seisin, and a disseisin by one *William McGlathry.* The only question at the trial, which was had before the Chief Justice, was upon the demandant's title to the flats; which he claimed under a deed from the Commonwealth of Massachusetts to *Stetson, French* and *Lapish,* as assignees of *James Budge*

an original settler; and which the tenants claimed under a prior deed from *Budge* to *M'Glathry.* The description in each of the deeds is recited hereafter in the opinion of the Court. The tenants offered to prove that the tide at this place ordinarily rises sixteen or eighteen feet; that the water is so fresh as to be generally used by mariners as any other fresh water; that the flats are about eight rods wide; that the bank is elevated from three to five feet above the ordinary high water mark; and is of solid earth; that at high water, vessels, boats and rafts have constantly passed over these flats; and that no person has ever been forbidden to take fish there. All which the demandant conceded. The tenant offered in evidence the *Waldo* patent, the Massachusetts charter granted by *William* and *Mary,* and the act incorporating the town of *Bangor.* He also offered the deed of the Commonwealth conveying to *Henry Knox* the township of *Bangor,* except a hundred acres reserved to each settler; for the purpose of disproving both the title and seisin of the demandant. But as the tenant claimed nothing under this deed, the Chief Justice rejected it; and upon the whole evidence he instructed the jury to find for the demandant, for whom they found accordingly; but he reserved the law of the case for the consideration of the Court. It was agreed that all the deeds and documents mentioned in the cases of *Lapish v. Wells,* 6 *Greenl.* 175, and *Dunlap & al. v. Stetson,* 4 *Mason* 349, might be considered in the decision of this cause. The other facts will be found in the opinion of the court.

*W. D. Williamson* argued for the tenants, that as the demandant was bounded by the bank, in his title deed, his claim to the flats must arise under the colonial ordinance of 1641. But this ordinance could extend no farther than the limits of the colony which passed it, and therefore never had any operation eastward of *Merrimack* river. These flats, then, belonged to the sovereign. *Commonwealth v. Charlestown,* 1 *Pick.* 182; *Commonwealth v. Chapin,* 5 *Pick.* 201; *Charter Jac.* 1. *Nov.* 3, 1620; 1 *Haz. Coll.* 103; *Ancient Char.* 34, 35; 2 *Dane's Abr.* 691.

But as the colony afterwards surrendered its charter to the king, it could not, on any principle, apply to grants made after the sur-

render. And if it could, it would avail nothing to the demandant, as it extends, by its terms, only to the shores and arms of the sea, and to " salt water rivers;" whereas the *Penobscot* at *Bangor* is merely a fresh water river, though its waters are raised and driven back by the influx of the sea.

*Allen*, on the same side, to the admissibility of the deed to *Knox*, cited *Walcott v. Knight*, 6 *Mass.* 413. And he argued that as *McGlathry* was *cestui que trust* of the acre, he, and not the demandant, was entitled to the flats in front of it, by the ordinance of 1641. He also contended that the case showed a sufficient title to the flats in the tenants, by disseisin. *Pray v. Pierce*, 7 *Mass.* 382; *Kennebec Proprietors v. Laboree*, 2 *Greenl.* 295 ; *Lansing v. Smith*, 4 *Wend.* 9.

*Greenleaf* and *Sprague*, for the demandant, cited *Adams v. Frothingham*, 3 *Mass.* 352, as reported by Mr. *Dane*, 2 *Dane's Abr.* 697; *Storer v. Freeman*, 6 *Mass.* 435 ; *Hatch v. Dwight*, 17 *Mass.* 289 ; *Dunlap v. Stetson*, 4 *Mason*, 365 ; *Handly's lessee v. Anthony*, 5 *Wheat.* 374 ; *Morrison v. Kean*, 3 *Greenl.* 474; *Lunt v. Holland*, 14 *Mass.* 149 ; *King v. King*, 7 *Mass.* 496; *Howard v. Chadbourne*, 5 *Greenl.* 15 ; *Knox v. Pickering*, 7 *Greenl.* 106 ; 7 *Pick.* 521 ; *Rex v. Smith & al.* *Doug.* 441 ; 2 *Dane's Abr.* 693, *sec.* 14.

MELLEN C. J. delivered the opinion of the Court, at the ensuing *July* term in *Waldo*.

By the report of the Judge who presided at the trial, in connection with the resolves and documents therein referred to, the following facts appear.

The premises demanded are situate in *Bangor*, consisting of upland and flats. The demandant having entered a *nolle prose qui* as to so much of the premises defended as lies above high water mark, with the privileges of water and landing in front of the same, the title to the flats is the only subject in dispute. The acre of land, of which two eighth parts are demanded, commonly called the *McGlathry* acre, is a part of a one hundred acre lot of land,

commonly called the *Budge* lot, on which *James Budge* formerly lived, and occupied the same as a settler prior to *January* 1, 1784. The flats in question are claimed by both parties, as belonging to and composing a part of the *Budge* lot; but whether they belong to, and compose a part of the *McGlathry* acre, is one of the controverted points. The tenants claim to hold them as a part of the acre in virtue of the deed from *Budge* to *McGlathry*, bearing date *April* 19th, 1798 : the description of the land conveyed by that deed will be particularly examined in its proper place. The demandant contends that the flats were never conveyed by that deed to *McGlathry*, and of course that they were conveyed to *Lapish*, *French* and *Stetson*, as the assignees of *Budge*, in virtue of the deed to them from the committee of the Commonwealth, bearing date *March* 2, 1802. Whatever estate or property passed by *Budge's* deed to *McGlathry*, has, by regular conveyances, become vested in the tenants. We now proceed to the examination of the titles relied on by the parties, and the statement of the principles and facts, more particularly, on which they are alleged to be legally founded.

The resolve of *March* 5, 1801, declares " That all the settlers in the town of *Bangor*, or their legal representatives, who actually settled before the first of *January* 1784, be entitled to a deed of their respective lots of one hundred acres each, by paying into the treasury of this Commonwealth, eight dollars and forty-five cents." The resolve further provides that the committee for the sale of eastern lands should cause the several lots in the town of *Bangor* to be surveyed and run out by metes and bounds to each of the settlers in said town by some faithful surveyor. Those preliminary measures were adopted in regard to the lot on which *James Budge* had settled as before mentioned, and they are recognized in the deed of *March* 2, 1802, to *Lapish, French* and *Stetson*. They are the legal representatives of the said *Budge*, as to all the lot, excepting what he had before that time conveyed to *McGlathry*. In the case of *Knox & al. v. Pickering*, 7 *Greenl.* 106, we have decided that the flats in front of, and adjoining to the settlers lots in

*Bangor,* belong to and compose a part of those lots respectively. See also *Bussey v. Luce,* 2 *Greenl.* 367.

In the view we have taken of this cause, we consider the *Waldo* Patent, the Charter of the Massachusetts bay and the act incorporating the town of *Bangor* as unimportant. They can have no influence on our decision. The same remark is also applicable as to all those facts relating to the height of the tide, the width of the flats, the quality of the water, the height of the bank and the nature of the fishery, which the tenants offered to prove and the demandant admitted.

The above examination of the facts shows, that the principal question in the cause is, whether, by the terms and description employed in the deed from *Budge* to *McGlathry,* the flats were conveyed, or only the upland. The language of the deed is this :— " a certain lot of land, lying and being in *Bangor,* on *Condeskeig* point, so called, bounded and described as follows, to wit : beginning at a stake, on the west bank of *Penobscot* river, near a thorn bush, marked on four sides, running north eleven rods to a stake and stones ; thence southerly to a stake and stones, a corner ; thence south nine rods to a stake and stones on the same bank of the same river ; thence running on the western bank of said river to high water mark, sixteen rods to the first mentioned bounds, with all the privileges of water and landing to the same belonging." The tenants have no claim to the flats in question, unless under the colonial ordinance of 1641, and the principle of our common law which was introduced by it : and to this ordinance and this principle his counsel has appealed, in his construction of the deed from *Budge* to *McGlathry* of the acre, in support of the title of the tenants ; and has contended, that by the language of that deed the flats in question passed. Every course and every monument mentioned in the foregoing description is on the upland or bank ; and from the language of the deed in describing the last course, it appears that the stake begun at, was at high water mark. In *Storer v. Freeman,* 6 *Mass.* 435, *Parsons C. J.* in delivering the opinion of the court says,—" The sea shore must be understood to be the

12

margin of the sea, in its usual and ordinary state. Thus when the tide is out, low water mark is the margin of the sea, and when the sea is full, the margin is high water mark. The sea shore is, therefore, all the ground between ordinary high water mark and low water mark." In that case the land conveyed was bounded by the shore, and the court decided that the flats did not pass by the deed. Now, as high water mark is one side of the sea shore or flats, and low water mark is the other, and as a deed bounding land on one side by the shore, does not convey the flats, it is perfectly clear that a deed bounding a piece of land by high water mark, which is one side of the shore, cannot be construed as conveying the flats. The case of *Storer v. Freeman* is decisive of the question in the present case. If the intention had been to convey the flats, there was no necessity for adding the words " with all the privileges of water and landing to the same belonging." These privileges would have passed without the special clause ; but upon the construction we have given, the clause is important as granting an easement to *Mc-Glathry*, though not extending the limits of the acre conveyed. *Hasty v. Johnson,* 3 *Greenl.* 282. As to the construction of the descriptive language relating to boundaries we also refer to *Hatch v. Dwight,* 17 *Mass.* 289, and *Morrison v. Kean,* 3 *Greenl.* 474. In addition to these authorities there is the case of *Dunlap & al. v. Stetson,* 4 *Mason,* 349, in which Mr. Justice *Story,* with his accustomed learning and accuracy, has examined the language of the deed now under our consideration and distinctly decided that upon the settled principles of construction, the flats, now in controversy, did not pass.

But it is, in the second place, contended that if the flats in front of the acre did not pass by *Budge's* deed to *McGlathry,* still the demandant is not entitled to recover ; for he must recover, if at all, on the strength of his own title, and not on account of the weakness of the tenants, as the court recently decided in the case of *Knox & al. v. Pickering*; and it is urged that the deed of *March* 2, 1802, from the Commonwealth to *Stetson, French* and the demandant, did not include and convey the flats to them. In de-

fending against the demandant's title, the counsel has contended against the ordinance as having never been in force in this State, nor applicable to it, or to such a river as the *Penobscot* at *Bangor*. It is certainly as applicable in the construction of the demandant's title as the tenant's. It is enough to say that this part of the defence is in every view of it wholly unsubstantial. If the descriptive language of this deed does not by law pass and convey the flats, then there is no proof of the seisin of *Lapish* on which he has counted, and the cause is with the tenant. This leads us to the examination of the deed. It was made under the authority of the resolve of *March* 5, 1801, directing the committee for the sale of eastern lands to cause the several lots in *Bangor* to be surveyed and run out by metes and bounds. This was done by *Park Holland*, and a return thereof was made by him to the committee, that he had laid out by metes and bounds, conformably to the resolve, to *Lapish* and others, assignees of *James Budge*, one hundred acres, and in the return stated the boundaries. The object of the resolve was to quiet the settlers in their respective lots and prescribe the mode in which it should be done; and the object of the commissioners, in the conveyance, was to vest in *Lapish* and others all *Budge's* equitable right, title and interest, as a settler on said lot; the legal title being in the Commonwealth. As has been before stated, this court have decided, that, according to the true construction of the resolve, each settler became entitled to the flats adjoining his upland; and that such flats belong to and compose a part of his lot. According to the principles of the ordinance, flats pass by a conveyance of upland as appurtenant thereto, without being included by the descriptive language of the instrument of conveyance; still, according to such descriptive language, the question is to be decided whether, in a particular case, such flats do pass : hence the numerous decisions, touching the construction of deeds of land adjoining tide waters, and rivers. The descriptive language of the deed in question is a copy of the return, and is as follows; " Beginning at a stump with stones about it, standing on the bank of the river; being the southwest corner of lot number 12, and

from thence north seven degrees west sixty rods to a pine stump marked; thence north two hundred and thirty one rods to a stake marked; thence west fifty seven rods to a fir tree marked; thence south about two hundred and twenty seven rods, to a stake standing in the county road, one rod east of an oak stump in said road; thence west four rods to the stream; thence on said stream on the bank thereof, and on the bank of the *Penobscot* river to the first bounds, containing one hundred acres, agreeably to the certificate of said *Holland*." As in the above description the words " stream" and " *Penobscot* river" are used, it is evident that the *Kenduskeag* stream is intended. The line from the abovementioned stump runs to the stream or *Kenduskeag* river; and thence on (which must mean by or adjoining) said stream and the bank thereof. Here the words " stream" and " bank" seem to be used as synonimous terms; and there is the same reason for supposing that the word " bank" was used in the same sense when connected with the words " *Penobscot* river ;" that is, that in both instances the meaning was to bound the land conveyed by the *Kenduskeag* stream and *Penobscot* river. This construction is supported by the circumstance that no course is given in the deed from the place where the north-end line of the lot strikes the stream, to the first mentioned bounds or stump begun at; and the only natural inference is that the circuitous line of the stream and river was intended as the boundary, thus constituting the grantees riparian proprietors, entitled by operation of the principle of the ordinance of 1641, to the adjacent flats, as *Budge* was considered to have been equitably entitled in virtue of the resolve of 1801. Being thus bounded by the stream and river, they own to the margin of both at all hours of the tide in its ebbing and flowing; or, in other words, as far as low water mark. Thus we perceive the difference between the rights of these grantees under the deed in question, and those of *McGlathry* under his deed of the acre; for that acre was bounded expressly by high water mark; by which the flats were necessarily excluded, as we have already decided. In the abovementioned case of *Dunlap & al. v. Stetson*, Mr. Justice *Story*, speaking of the commissioners'

deed of 1802, says, " It is most manifest that the deed conveyed to the grantees the whole lot, supposing them to be assignees of *Budge* of the whole one hundred acres." He states, in another place, that the deed conveyed "all the right, title and interest of the Commonwealth in and to the same lot;" and such right, title and interest was that which was reserved and preserved for the settler on the lot, in and by the abovementioned resolve, including the adjoining flats. It has been contended by the counsel in the defence, as before observed, that for several reasons the colonial ordinance of 1641 does not apply in the present case, either by enactment, construction or adoption. The history of it is given in *Storer v. Freeman*, 6 *Mass.* 435, by *Parsons C. J.*, and he observes, " This ordinance was annulled with the charter, by the authority of which it was made ; but from that time to the present, an usage has prevailed, which has now the force of our common law." Ever since that decision, as well as long before, the law on this point has been considered as perfectly at rest ; and we do not feel ourselves at liberty to discuss it as an open question. We deem the usage in question or the principle of law above stated as applicable to the flats demanded as in any other case, concerning this species of property. The upland adjoins tide waters, and though at *Bangor* the river is fresh water, that circumstance has not been considered as changing the legal principle. The idea was not suggested in *Dunlap & al. v. Stetson*, though the cause underwent a long and learned examination. But it cannot be necessary for us to proceed further, than merely to say that there is not a particle of proof on which to ground the observation of the counsel that the demandant has been disseised by the tenants or any other persons.

We are all of opinion that the defence does not rest on any legal foundation.

*Judgment on the Verdict.*