MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:        2019 ME 45
Docket:          Was-17-142
Argued:          November 14, 2017
Decided:         March 28, 2019

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:     ALEXANDER, JABAR, HJELM, and HUMPHREY, JJ.
Concurrence:  SAUFLEY, C.J., and MEAD and GORMAN, JJ.

KENNETH W. ROSS et al.

v.

ACADIAN SEAPLANTS, LTD.

HJELM, J.

[¶1]  This case draws us again into the confluence of public and private property rights within the intertidal zone—this time, to address the ownership of rockweed, a species of seaweed that grows in Maine's intertidal zone and is often found on the rocky ledges that accent the State's coastline.  Specifically, we are asked to determine whether rockweed is private property that belongs to the adjoining upland landowner who owns the intertidal soil in fee simple, or property that is held in trust by the State through the *jus publicum* for the public to harvest.

[¶2]  Acadian Seaplants, Ltd., appeals from a summary judgment entered by the Superior Court (Washington County, *Stewart, J.*) in favor of Kenneth W.

Ross, Carl E. Ross, and Roque Island Gardner Homestead Corporation (collectively, Ross), who are owners of upland property where—without the landowners' permission—Acadian has harvested rockweed that is attached to the intertidal land.[1]  In its judgment, the court declared that rockweed growing in the intertidal zone is the private property of the upland property owners. We agree that rockweed in the intertidal zone belongs to the upland property owner and therefore is not public property, is not held in trust by the State for public use, and cannot be harvested by members of the public as a matter of right.  Accordingly, we affirm the judgment.

## I.  BACKGROUND

[¶3]  The following facts are taken from the parties' stipulated joint statement of material facts, submitted to the court on cross-motions for summary judgment.  *See BCN Telecom, Inc. v. State Tax Assessor*, 2016 ME 165, ¶ 3, 151 A.3d 497.

---

[1]  On this appeal, amici briefs have been filed by the Cobscook Bay Fishermen's Association; Conservation Law Foundation; Downeast Coastal Conservancy; Downeast Lobstermen's Association; Hale Miller; Jonesport and Beals Commercial Fishermen and Lobstermen; Maine Clammers Association, Independent Maine Marine Worm Harvesters Association, North American Kelp, and Gulf of Maine, Inc.; Maine Coast Fishermen's Association; Maine Coast Heritage Trust; Maine Department of Marine Resources; Maine Seaweed Council; Pacific Legal Foundation and Property and Environment Research Center; and Pleasant River Wildlife Foundation.  *See* M.R. App. P. 9(e) (Tower 2016).

[¶4]   Rockweed is the common name for several species of brown seaweed, or macroalga.  The most abundant of the species is known by the scientific name *Ascophyllum nodosum* and is often found on rocks and ledges in the intertidal portions of Maine's seacoast.  Rockweed is a plant.  It does not grow in intertidal sand but obtains its nutrients from the surrounding seawater and air.  Rockweed attaches to hard, stable objects such as ledges and rocks using a disc-like structure called a holdfast.  The sole function of the holdfast is to secure the rockweed in place by penetrating the surface of substrate by up to four millimeters.  A rockweed's holdfast typically remains intact and attached to a substrate for decades, allowing rockweed to generate new growth. If the rockweed becomes detached from a substrate, it cannot reattach its holdfast to a different substrate and will float freely in the water or be cast onto the land.  Rockweed, which is typically two to four feet in length but can grow to be more than six feet, is important to Maine's coastline ecology because it moderates temperatures and provides a habitat for marine organisms.

[¶5]  Acadian is a commercial entity that operates in Maine and Nova Scotia and harvests rockweed from the Maine intertidal zone for use in various commercial products, such as fertilizer and animal feed.  Acadian harvests rockweed during mid-tide, using three-to-four-ton-capacity skiffs and specially

designed cutting rakes. During the harvesting operation, Acadian operates the watercraft in intertidal waters without walking or traveling on the intertidal land itself. The Department of Marine Resources regulates the harvest of rockweed in Cobscook Bay. *See* 12 M.R.S. § 6803-C (2018); *see also id.* § 6001(7), (13).[2] Acadian annually harvests the statutory maximum 17 percent of eligible harvestable rockweed biomass in Cobscook Bay. *See id.* § 6803-C(9).

[¶6] Ross owns coastal intertidal property on Cobscook Bay, and Acadian has harvested rockweed from Ross's intertidal property without his consent. In December of 2015, Ross commenced this action by filing a two-count complaint against Acadian, seeking, in Count 1, a declaratory judgment that he exclusively owns the rockweed growing on and affixed to his intertidal property, and, in Count 2, injunctive relief that would prohibit Acadian from harvesting rockweed from his intertidal land without his permission. Acadian's answer to the complaint included a counterclaim for a judgment declaring that

---

[2] The Department of Marine Resources, as amicus curiae, argues that 1 M.R.S. § 2(2-A) (2018), which governs State regulation of harvesting of marine resources, establishes the public's right to harvest rockweed from the intertidal zone because the statute vests ownership of that seaweed with the State and therefore not with the upland property owners. In a one-sentence footnote in its reply brief, Acadian states that it adopts the Department's arguments. This contention, however, was not meaningfully developed in the trial court and is therefore not preserved for appellate consideration. *See Penkul v. Matarazzo*, 2009 ME 113, ¶ 11, 983 A.2d 375 (stating that an issue "not presented to the trial court . . . is not properly before this Court on appeal"); *see also Jacobs v. Jacobs*, 507 A.2d 596, 597 n.1 (Me. 1986) (stating that we will consider an argument raised in an amicus brief "only to the extent[] that it addresses issues raised before the trial court and pursued here by the parties themselves").

harvesting rockweed from the intertidal water is a form of "fishing" and "navigation" within the meaning of the Colonial Ordinance and is therefore a public right.[3]   The parties filed cross-motions for summary judgment predicated on a joint statement of material facts.  *See* M.R. Civ. P. 56.  In March of 2017, after holding a hearing, the court (*Stewart, J.*) granted Ross's motion in part by entering summary judgment for Ross on his request for declaratory judgment in Count 1 of his complaint.  The court also entered judgment for Ross on Acadian's counterclaim and denied Acadian's motion.  Ross then moved to dismiss Count 2 of the complaint, and the court granted the motion without objection from Acadian, resulting in the entry of a final judgment.  Acadian filed a timely notice of appeal.  *See* 14 M.R.S. § 1851 (2018); M.R. App. P. 2(b)(3) (Tower 2016).[4]

## II.  DISCUSSION

[¶7]   Because the facts presented are not in dispute, we review the summary judgment de novo for errors of law in the court's interpretation of the

---

[3] Acadian also filed a motion to dismiss Ross's complaint for failure to join the State as a necessary party. *See* M.R. Civ. P. 12(b)(7), 19.  The court (*Stokes, J.*) denied the motion after concluding that the State was not exposed to any current or future litigation as a result of the private claims asserted in this action.  No party challenges that determination on appeal.

[4] Because this appeal was filed before September 1, 2017, the restyled Maine Rules of Appellate Procedure do not apply. *See* M.R. App. P. 1 (restyled Rules).

relevant legal concepts.  *See Beane v. Me. Ins. Guar. Ass'n*, 2007 ME 40, ¶ 9, 916 A.2d 204; *see also Remmes v. Mark Travel Corp.*, 2015 ME 63, ¶ 19, 116 A.3d 466 ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se." (quotation marks omitted)).

[¶8]  The limited issue before us is whether living rockweed, growing on and attached to intertidal land, is—as Ross asserts—the private property of the adjoining upland landowner who owns the intertidal zone in fee, or—as Acadian counters—a public resource held in trust by the State.

A.    Intertidal Property Rights

[¶9]  Our consideration of this dispute takes us back to the analytical foundations of the law governing rights to the intertidal zone: the interrelated common law public trust doctrine and the rights embodied in the Massachusetts Bay Colony's Colonial Ordinance of 1641-47.  In past opinions, we have described the legal principles emanating from these laws.  *See, e.g.*, *McGarvey v. Whittredge*, 2011 ME 97, ¶¶ 8-41, 28 A.3d 620; *Bell v. Town of Wells (Bell II)*, 557 A.2d 168, 170-79, 180-89 (Me. 1989); *Bell v. Town of Wells (Bell I)*, 510 A.2d 509, 511-17 (Me. 1986).  Given the extensive discussion in those

opinions, we need not describe the historical origins and developments in detail here.

[¶10] In short, the English common law tradition vested both "title" to and "dominion" over the intertidal zone in the crown. *Shively v. Bowlby*, 152 U.S. 1, 11 (1894). Title—the *jus privatum*—belonged to the crown "as the sovereign" but was held subject to the public's rights of "navigation," "commerce," and "fishing"—the *jus publicum*—which the crown held in trust for the public. *Id.* After the American colonies gained independence, the ownership of intertidal land devolved to the particular state where the intertidal area was located. *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 476 (1988); *Shively*, 152 U.S. at 14-15; *State v. Leavitt*, 105 Me. 76, 78-79, 72 A. 875 (1909). Each state nonetheless remained free to modify its laws governing ownership of the intertidal zone. *Shively*, 152 U.S. at 18. In a decision issued in 1810, the Massachusetts Supreme Judicial Court ratified the vitality of the Colonial Ordinance. *Storer v. Freeman*, 6 Mass. 435, 438 (1810). The Colonial Ordinance had conveyed fee title to the intertidal zone—described as the area from the mean high-water mark to the mean low-water mark but not more than 100 rods—to the upland landowner subject to the public's right to use the wet sand for "navigation," "fishing," and "fowling"—the latter being an

additional use allowed by the Ordinance that augmented the uses already allowed by the English public trust doctrine. *See Bell I*, 510 A.2d at 512-15. Thus, the upland owners obtained fee title to the wet sand to allow them to "wharf out," *see Conservation Law Found. v. Dep't of Envtl. Prot.*, 2003 ME 62, ¶ 36, 823 A.2d 551, and the public retained an easement interest in that intertidal zone, *see Norton v. Town of Long Island*, 2005 ME 109, ¶ 32, 883 A.2d 889; *Bell I*, 510 A.2d at 516.

[¶11] When Maine attained statehood in 1820, by force of the Maine Constitution the arrangement of private ownership by the upland owners and the right of the public—the *jus publicum*—was engrafted into Maine common law. *See* Me. Const. art. X, §§ 3,[5] 5;[6] *see also Bell I*, 510 A.2d at 513-14; *State v. Wilson*, 42 Me. 9, 28 (1856) (acknowledging that "[s]o far as the public had authority to use the shore under the common law of the State, as declared in the proviso of the Colonial [O]rdinance of 1641 . . . [s]ubject to this public right, [the property owner's] title to the shore was as ample as to the upland"); *Lapish*

---

[5] Article X, section 3 of the Maine Constitution provides in full, "All laws now in force in this State, and not repugnant to this Constitution, shall remain, and be in force, until altered or repealed by the Legislature, or shall expire by their own limitation."

[6] Article X, section 5 of the Maine Constitution provides and adopts the Massachusetts Act of Separation. That provision is omitted from printed copies of the Constitution but remains in full force. *See* Me. Const. art. X, § 7; 1 Laws of Maine 1821 at 45-50 (text of article X, section 5).

*v. Bangor Bank*, 8 Me. 85, 93 (1831) (stating that "[e]ver since [*Storer v. Freeman*, 6 Mass. 435 (1810)], as well as long before, the law on this point has been considered as perfectly at rest").

[¶12] The result is that, in Maine, there are three separate shoreland areas subject to distinct public and private rights. *See Britton v. Donnell* (*Britton II*), 2011 ME 16, ¶ 6, 12 A.3d 39. First, the land below the mean low-water mark is owned by the State. *See id.* ¶ 7. Second, the dry sand, above the mean high-water mark, belongs exclusively to the upland property owner. *See id.* ¶¶ 6-7. Finally, there is the area that is the subject of the present dispute: the intertidal zone—the land between the mean high-water mark and the mean low-water mark up to 100 rods, 12 M.R.S. § 572 (2018) (defining "intertidal land" as "all land of this State affected by the tides between the mean high watermark and either 100 rods seaward from the high watermark or the mean low watermark, whichever is closer to the mean high watermark"); *see also Britton II*, 2011 ME 16, ¶ 6, 12 A.3d 39; *Bell I*, 510 A.2d at 515. The intertidal zone belongs to the owner of the adjacent upland property, or some other person to whom that part of the land has been transferred by the upland owner, "subject to certain public rights." *Britton II*, 2011 ME 16, ¶ 7, 12 A.3d 39.

[¶13]  The nature and extent of the public's interest in the intertidal zone has been a subject of much debate, litigation, and judicial writing.  Our jurisprudence has not clearly established, for all purposes, the delineation between the public and private rights in and to the intertidal area.  Differing views within this Court regarding the nature and scope of the public's right to use the intertidal zone became evident in our 1989 decision in *Bell II*.  Those differences were most recently brought into sharp focus in *McGarvey v. Whittredge*, 2011 ME 97, 28 A.3d 620.  There, the question presented was "whether, as a matter of Maine common law, the public has the right to walk across intertidal lands to reach the ocean for purposes of scuba diving." *Id.* ¶ 1. All six justices who participated in that case agreed that that use was within the scope of the public trust doctrine.  *Id.*  The Court was evenly divided, however, on the rationale supporting that conclusion.  *Compare id.* ¶¶ 48-58, *with* ¶¶ 59-78.

[¶14]  Despite these divergent views concerning the scope of the public's intertidal property rights, only one conclusion obtains in this case: the public may not harvest living rockweed growing in and attached to the privately-owned intertidal zone. We explain this outcome with reference to the two analytical frameworks articulated in *McGarvey*.

B.     *McGarvey v. Whittredge*

[¶15]   In the first of the two doctrinal views discussed in *McGarvey* regarding the nature of the public trust rights, Chief Justice Saufley wrote that "[r]ather than stretching the definitions of these three terms [fishing, fowling, and navigation] beyond their reasonable limits . . . , we return to the roots of the common law."   *Id.* ¶ 53.   Pursuant to that approach, the terms "'fishing,' 'fowling,' and 'navigation'" must be "broad[ly] underst[ood]" and, over time, have been "adapted to reflect the realities of use in each era." *Id.* ¶¶ 37, 39.  This approach is consistent with the analysis articulated in Justice Wathen's dissenting opinion in *Bell II*, 557 A.2d at 188, which "rejected a rigid application of the terms of the Ordinance and resorted to contemporary notions of usage and public acceptance in order to strike a rational and fair balance between private ownership and public rights."

[¶16]  This broad and adaptive approach reflects "judicial unease with a rigid interpretation" of the terms "fishing," "fowling," and "navigation"—terms that were referenced in the Colonial Ordinance and that may, pursuant to the broader interpretations urged originally by Chief Justice Wathen and more recently by Chief Justice Saufley, too narrowly describe the public trust doctrine.  *McGarvey*, 2011 ME 97, ¶ 56, 28 A.3d 620.

[¶17]  Therefore, even if an activity carried out by a member of the public does not "fall readily" within the notions of "fishing," "fowling," or "navigation," the activity may nonetheless be protected by the public trust doctrine so long as, pursuant to the common law, the activity constitutes "a reasonable balance between private ownership of the intertidal lands and the public's use of those lands."  *Id.* ¶¶ 49, 57.  On the particular facts presented in *McGarvey*, Chief Justice Saufley's opinion concluded that even though passing over the wet sand in order to scuba dive could not "readily" be seen as a type of "navigation," the public was nonetheless entitled to engage in that activity as a matter of general common law because it represents "a reasonable balance" between the private and public rights to the intertidal zone.  *Id.* ¶¶ 49-50, 56-58.

[¶18]  In a separate opinion, Justice Levy, writing for the other half of the Court's panel in the case, analyzed the question based on the limiting principle that the enumerated rights of "fishing," "fowling," and "navigation" were "never understood . . . to merely establish a context for some broader right or rights."  *Id.* ¶ 62.  Pursuant to this approach, while those terms delimit the public's rights, they must be interpreted in a way that is "sympathetically generous and broad."  *Id.* ¶ 71; *see also Bell II*, 557 A.2d at 173 (summarizing prior case law as allowing for "a sympathetically generous interpretation to what is

encompassed within the terms 'fishing,' 'fowling,' and 'navigation,' or reasonably incidental or related thereto"). Construing "navigation" in that expansive way—but not looking beyond it—Justice Levy's concurring opinion concluded that scuba diving fell within the ambit of "navigation" because it is an activity that involves equipment and methods that are similar to those used in traditional forms of navigation. *McGarvey*, 2011 ME 97, ¶¶ 75-76, 28 A.3d 620.

C.      Application of the Two Doctrinal Views

[¶19]  We now turn to the narrow issue presented here: is harvesting living rockweed, growing in and attached to the intertidal zone, an activity that is authorized and protected by the public trust doctrine?

[¶20]  In addressing the harvesting activity, we first consider whether harvesting living rockweed from the intertidal zone is a form of "fishing" or "navigation" as those activities are understood in Justice Levy's concurrence in *McGarvey*.  We conclude that, contrary to Acadian's contention, harvesting living rockweed secured to the intertidal bed cannot be seen as either "fishing" or "navigation," even when those terms are interpreted in a "sympathetically broad and generous" way.  *Id.* ¶ 71.  Then we apply the more expansive "common law" approach urged by the Chief Justices and the concurrence to this

opinion and address whether the common law permits the public to harvest rockweed as an activity that constitutes a "reasonable balance" between the public's rights within the intertidal zone and the private property interests held by the upland property owner. *Id.* ¶¶ 49, 57. Ultimately, we also answer this question in the negative.

1. Application of the Trilogy

[¶21] We first address the two relevant constituents of the trilogy: "navigation" and "fishing."[7]

a. Navigation

[¶22] "Navigation" has been interpreted to involve some mode of transportation, whether traveling over frozen intertidal water, *see French v. Camp*, 18 Me. 433, 434-35 (1841), passing on intertidal land to get to and from land or houses, *see Deering v. Proprietors of Long Wharf*, 25 Me. 51, 65 (1845), or mooring vessels and loading or unloading cargo, *see id.*; *Wilson*, 42 Me. at 24.[8] In each of these instances, the primary activity is crossing the intertidal water or land itself. *See, e.g.*, *French*, 18 Me. at 434 (stating that State-owned waters

---

[7] Acadian does not argue—nor could it—that harvesting rockweed is a type of "fowling," which is the third part of the trilogy.

[8] As is discussed above, some members of this Court also concluded that scuba diving is a type of navigation. *McGarvey v. Whittredge*, 2011 ME 97, ¶¶ 75-77, 28 A.3d 620 (Levy, J., concurring). This was not the majority view, however, because the Court was evenly divided on that question. *Id.* ¶ 1.

are "of common right, a public highway, [available] for the use of all the citizens"). Although there is a navigational component to harvesting rockweed, it is secondary to what Acadian seeks to do. Rather, the harvesters operate the skiffs in intertidal waters for the principal purpose of engaging in a different, nonnavigation activity, namely, cutting and taking significant portions of rockweed plants. The harvesting of rockweed, even by boat, involves the use of the intertidal land itself because living rockweed is attached to the intertidal substrate even if it does not draw nutrients from the land. Therefore, Acadian uses the intertidal waters not for "navigation" in its own right, but merely to gain access to the attached rockweed. *See Gerrish v. Brown*, 51 Me. 256, 262 (1863) ("The term *navigation*, as applied to waters which are used as highways, imports something different; it denotes the transportation of ships or materials[] from place to place . . . .").

[¶23] Therefore, no matter how broadly "navigation" is viewed, it does not encompass harvesting living rockweed from the intertidal zone.

        b.    Fishing

[¶24] Harvesting rockweed—which the parties stipulated is a *plant*—is not a form of "fishing." *See Small v. Wallace*, 124 Me. 365, 367, 129 A. 444 (1925) (stating that a landowner's right to fish "arises not out of their

ownership of the soil but from [the landowner's] right to share in the common right of fishery reserved to the public"). The two types of ventures are qualitatively different from each other.

[¶25] In cases involving the public's rights within the intertidal zone, we have viewed the concept of "fishing" broadly. We have not imposed limitations based on the fishery or the method used for fishing, *see Moulton v. Libbey*, 37 Me. 472, 489-90 (1854), and we have recognized the public's right to use the intertidal zone to dig for shellfish, *see Leavitt*, 105 Me. at 79-81, 72 A. 875; *Moulton*, 37 Me. at 493-94, and bloodworms, *see State v. Lemar*, 147 Me. 405, 409, 87 A.2d 886 (1952). *See also State v. Norton*, 335 A.2d 607, 610 (Me. 1975) (recognizing the State's authority to regulate the harvest of shellfish by the public).

[¶26] Nonetheless, even a "sympathetically generous and broad interpretation of the public's rights"—something that "is not . . . without limits," *McGarvey*, 2011 ME 97, ¶ 69, 28 A.3d 620 (Levy, J., concurring)—cannot transform the harvesting of a marine plant into "fishing." *Cf. Moore v. Griffin*, 22 Me. 350, 356 (1843) (holding that the taking of mussel-bed manure does not

fall within the public trust rights);[9] *Marshall v. Walker*, 93 Me. 532, 537, 45 A. 497 (1900) (stating that the public "may not take shells or mussel manure or deposit scrapings of snow upon the ice over [the intertidal land]").

[¶27]    Rockweed is biologically dissimilar from fish, lobster, clams, oysters, and bloodworms—it draws nutrients from the air and seawater using a photosynthetic process and, once attached to the intertidal substrate, does not move.    *See Moulton*, 37 Me. at 489-90 (stating that "the general term '*piscaria*,' or its equivalent, is used as including all fisheries, without any regard to their distinctive character, or to the method of taking *the fish*" and giving examples of regulated "fisheries" to include oyster, lobster, salmon, herring, and pilchard (second emphasis added)).    After arguing in its brief that "seaweed is a marine organism, not a terrestrial plant," at oral argument Acadian acknowledged that there is no legal distinction between plants growing in the soil in the intertidal zone and those growing on the rocks in that same area.  The

---

[9] Mussel-bed manure comprises shells mixed with the soil. *See Opinion of Justices*, 313 N.E.2d 561, 567 (Mass. 1974) (stating that mussel mud consists of "living and dead shell fish . . . and the soil or clay in which they were found" (alteration in original) (quoting *Porter v. Shehan*, 73 Mass. 435, 436 (1856)); E.H. Jenkins & John Phillips Street, *Manure from the Sea*, 194 Conn. Agric. Experiment Station 1, 11 (1917) (referring to "marine mud" as "mud taken from flats at low tide or cast up on the shore of an inlet . . . [and i]n some places vast quantities of small shells, ground fine by the waves, are cast up with the mud").

fundamental dissimilarities between the harvesting of fish and of rockweed as

a marine plant demonstrate that Acadian is not in the business of "fishing."[10]

---

[10] The parties have addressed two of our opinions that make reference to intertidal seaweed. For differing reasons, we find neither to be dispositive.

The earlier of the two opinions, which was issued more than 150 years ago, states that "seaweed belongs to the owner of the soil upon which it grows, or is deposited, unless some other person has acquired the right to take it." *Hill v. Lord*, 48 Me. 83, 99 (1861) (emphasis omitted). The analysis, however, contains several statements about the nature of seaweed that do not fully square with the stipulated record here. For example, *Hill* states that seaweed grows partially "on the beach." *Id.* at 96. This was significant to the conclusion that seaweed is a profit "in the soil" and not subject to the public's easement rights to use the intertidal waters. *Id.* at 99-100. Here, in their joint statement of material facts, the parties stipulated that rockweed is an intertidal seaweed—meaning that it "does not grow on intertidal sandy beach except [attached to] hard . . . objects."

We do not entirely reject *Hill*, however. As Acadian acknowledged at oral argument, there is no principled legal distinction between plants growing in the soil in the intertidal zone and those growing on the rocks in that same area, which supports the application of the doctrine of profit a prendre that underlies the analysis in *Hill*. Further, *Hill* has been invoked as authority in more recent case law. *See, e.g., Bell v. Town of Wells (Bell II)*, 557 A.2d 168, 187 (Me. 1989) (Wathen, J., dissenting). To the extent that *Hill* has persuasive effect, the case favors Ross, but we do not place dispositive weight on it. *See Appeal of Robinson*, 88 Me. 17, 23, 33 A. 652 (1895) ("The common law would ill deserve its familiar panegyric as the 'perfection of human reason,' if it did not expand with the progress of society and develop with new ideas of right and justice."); *Woodman v. Pitman*, 79 Me. 456, 458, 10 A. 321 (1887) ("The inexhaustible and ever-changing complications in human affairs are constantly presenting new questions and new conditions which the law must provide for as they arise . . . ."); *see also* Mitchell W. Feeney, Comment, *Regulating Seaweed Harvesting in Maine: The Public and Private Interests in an Emerging Marine Resource Industry*, 7 Ocean & Coastal L.J. 329, 343 (2002) (discussing the erroneous scientific principles upon which the Court in *Hill v. Lord* appears to rely, and noting that it "is now known that seaweeds do not receive their nutrients form the soil, but from the surrounding water column [and t]heir only reliance on the soil is for anchorage purposes").

The second case is *Marshall v. Walker*, 93 Me. 532, 45 A. 497 (1900), which Acadian cites favorably. That opinion states that the public is entitled to "take sea manure" (which includes seaweed and is given that description because of its use as a fertilizer, *see generally* Jenkins & Street, *supra*; *see also* 1 F.H. Storer, *Agriculture in Some of Its Relations with Chemistry* 462 (4th ed. 1892)) from the intertidal zone. *Marshall*, 93 Me. at 536-37, 45 A. 497. No authority, however, is offered for that assertion. Further, *Marshall* was a quiet title action and did not determine the nature of the public's rights to the land or implicate questions of public ownership. Therefore, the opinion's general discussion of the nature of the public's rights is dictum on which we do not place weight. *See Legault v. Levesque*, 150 Me. 192, 195, 107 A.2d 493 (1954) (stating that *obiter dictum* is "an assertion of law not necessary to the decision of the case" (quotation marks omitted)).

2.    Application of the Common Law and "Reasonable Balance" Approach

[¶28]  Having concluded that harvesting rockweed is neither "navigation" nor "fishing" pursuant to the "sympathetically generous and broad" approach described in Justice Levy's *McGarvey* concurrence, *see* 2011 ME 97, ¶ 71, 28 A.3d 620, we further conclude that, likewise, the activity does not "fall readily" within either category of "navigation" or "fishing," as discussed in Chief Justice Saufley's concurring opinion in *McGarvey*, *see id.* ¶ 49.  Thus, we turn to the additional inquiry explained by both Chief Justice Saufley in *McGarvey* and by the *Bell II* dissent, which calls for an assessment of whether the removal of rockweed by members of the public from privately owned land is within the common law principle that looks to achieve a "reasonable balance" between the private landowner's interests and the rights held by the State in trust for the public's use of that land.  *See id.* ¶¶ 41, 49, 57.

[¶29]  In answering this question, we draw further guidance from Chief Justice Wathen's dissenting opinion in *Bell II*, 557 A.2d at 188-89, which espouses the same broader view of the public trust rights described in Chief Justice Saufley's discussion of the extent of those rights in *McGarvey*, 2011 ME 97, ¶¶ 47, 49, 28 A.3d 620.  We conclude that even pursuant to that school of

thought, the harvesting of seaweed attached to the intertidal land falls outside the scope of activities that can be carried out as a matter of public right.

[¶30] The criterion used in the *Bell II* dissenting opinion calls for consideration of "contemporary notions of usage and public acceptance in order to strike a rational and fair balance between private ownership and public rights." 557 A.2d at 188. In finding the appropriate balance, "we must avoid placing any additional burden upon the shoreowner"—a burden that can result when something is taken from the intertidal lands. *Id.* at 188-89. In formulating that standard, the dissent drew on a collection of our cases, including *Hill v. Lord*, 48 Me. 83, 96 (1861), which prohibited the removal of seaweed from intertidal lands belonging to another. *Bell II*, 557 A.2d at 185-89. It is significant here that even a broad view of the public trust rights explained in the *Bell II* dissent does not encompass the harvesting of seaweed.[11]

---

[11] We are careful not to push the limits of the dissenting analysis in *Bell II* too far. While the dissent concluded that, in his view, the public's rights included "such recreational activities as bathing, sunbathing and walking," he specifically did "not attempt to provide a comprehensive definition of the recreational activities" that are within the scope of the public's common law rights. *Bell II*, 557 A.2d at 189. Setting aside the question of whether, for purposes of determining the scope of intertidal rights, commercial activities can be equated with recreational activities, the core principle urged by the dissent was drawn from the lessons of our case law, including *Hill*. *Id.* at 181-89. Thus, although—given the explicit limitation noted above—the dissent in *Bell II* cannot be read to state directly that removing seaweed is outside the scope of the public's right to use the intertidal waters, the dissent's use of *Hill* to derive the baseline principle of a "rational and fair balance" of public and private rights, *id.* at 188, is significant here.

[¶31]  This is a reasonable and proper demarcation between the competing interests at stake here.  The "additional burden" imposed on the owner of the intertidal zone, *id.* at 188, is not reasonable when the nature of the interference consists of cutting and removing marine plants from the intertidal zone, proximate to the dry sand on which the public has *no* independent rights, with the use of specialized equipment and skiffs that have a multi-ton capacity.  Furthermore, Acadian's activity is qualitatively similar to other uses of the intertidal zone that we have held are outside of the public trust doctrine.  *See, e.g.*, *McFadden v. Haynes & DeWitt Ice Co.*, 86 Me. 319, 325, 29 A. 1068 (1894) (holding that although a person may pass over intertidal land to fish, that person may not enter that land for the purpose of cutting ice); *King v. Young*, 76 Me. 76, 80 (1884) (holding that the Colonial Ordinance does not permit taking mussel-bed manure from another's intertidal land); *Moore*, 22 Me. at 356 (same); *see also* Mitchell W. Feeney, Comment, *Regulating Seaweed Harvesting in Maine: The Public and Private Interests in an Emerging Marine Resource Industry*, 7 Ocean & Coastal L.J. 329, 340-41 (2002) ("[N]owhere in the body of Maine case law has fishing been held to include the collection of vegetable matter.  Migratory resources (like fish, and presumably shellfish and worms)

have traditionally been less protected by private property rights than stationary resources such as attached seaweed.").

[¶32] Therefore, the harvesting of rockweed is not encompassed within the rights held by the public even when those rights are viewed from the broader of the perspectives explained in our case law.

## III. CONCLUSION

[¶33] For these reasons, we conclude that, pursuant to both of the differing legal constructs our opinions have articulated to define the scope of the public's intertidal property rights, rockweed attached to and growing in the intertidal zone is the private property of the adjacent upland landowner. Harvesting rockweed from the intertidal land is therefore not within the collection of rights held in trust by the State, and members of the public are not entitled to engage in that activity as a matter of right. And because neither view of the public's right to use the intertidal zone accommodates the activity at issue here, we determine—contrary to the position of the concurring justices— that this case does not present us with the occasion to consider the vitality of the holding in *Bell II*.

The entry is:

Judgment affirmed.

SAUFLEY, C.J., with whom MEAD and GORMAN, JJ., join, concurring in part.

[¶34] In 1989, the Law Court, in a sharply divided opinion, made a regrettable error, limiting public access to the intertidal zones on Maine's beaches in *Bell v. Town of Wells* (*Bell II*), 557 A.2d 168 (Me. 1989). Since that time, a member of the public has been allowed to stroll along the wet sands of Maine's intertidal zone holding a gun or a fishing rod, but not holding the hand of a child.

[¶35] Recognizing, as the majority concludes, that the pronouncement of that four-justice majority in *Bell II* is not ultimately dispositive in the matter before us, we would, nonetheless, clarify the applicable law and set aside the holding in *Bell II*. Accordingly, we concur in the result of the Court's opinion, but we do not join the analysis because we would take this opportunity to explicitly overrule *Bell II*.

[¶36] *Bell II,* which addressed the intertidal zone at Moody Beach in Wells, was decided thirty years ago. *Id.* at 170. Prior to that decision, as a matter of common law, the public had long enjoyed reasonable access to the intertidal zone. *Id.* at 180, 184-85 (Wathen, J., dissenting). The extent of and

limitations on that access had evolved over centuries to adapt to the differing and reasonable uses of the public.[12]  *See id.* at 185-89.

[¶37]   As predicted in the *Bell II* dissent, *id.* at 192, and in another separate opinion issued in its wake, *Eaton v. Town of Wells*, 2000 ME 176, ¶ 52, 760 A.2d 232 (Saufley, J., concurring), *Bell II* has generated significant and expensive litigation resulting from the Court's limitation of the public's allowable activities to those that can be forced into the definitions of "fishing, fowling, and navigation," *Bell II*, 557 A.2d at 169.  The constrictive trilogy of that holding has bedeviled the State of Maine since that opinion was issued, and we

---

[12]   Permissible activities that had been held to fall within the public trust rights before the imposition of the constrictive trilogy in *Bell v. Town of Wells (Bell II)*, 557 A.2d 168, 173 (Me. 1989), included the following: digging for worms, *State v. Lemar*, 147 Me. 405, 408-09, 87 A.2d 886 (1952); landing on, receiving and discharging passengers from, and walking across intertidal land to access a power boat for hire, *Andrews v. King*, 124 Me. 361, 362-64, 129 A. 298 (1925); clamming, *State v. Leavitt*, 105 Me. 76, 77-80, 72 A. 875 (1909); transporting merchandise, rafting, driving logs, and floating or propelling boats across intertidal land, whether for commercial or recreational purposes, *Smart v. Aroostook Lumber Co.,* 103 Me. 37, 47-48, 68 A. 527 (1907); sailing over, mooring a vessel on, walking across, riding or skating on ice over, digging shellfish in, and taking sea manure from intertidal land, *Marshall v. Walker*, 93 Me. 532, 536-37, 45 A. 497 (1900); mooring a vessel, discharging passengers, and taking on cargo, *State v. Wilson*, 42 Me. 9, 24-25 (1856); fishing for shellfish, *Moulton v. Libbey*, 37 Me. 472, 489-90 (1854); passing to other property after landing a boat, *Deering v. Proprietors of Long Wharf*, 25 Me. 51, 64-65 (1845); and traveling over frozen waters, *French v. Camp*, 18 Me. 433, 434-35 (1841).

Activities of the public prohibited in the intertidal zone before *Bell II* included taking shells or mussel manure, or depositing snow or ice, *Marshall*, 93 Me. at 536-37; cutting ice or depositing snow, *McFadden v. Haynes & DeWitt Ice Co.*, 86 Me. 319, 325, 29 A. 1068 (1894); harvesting seaweed, *Hill v. Lord*, 48 Me. 83, 100 (1861); and removing mussel-bed manure, ballast, or sand, *Moore v. Griffin*, 22 Me. 350, 355-56 (1843).  With the issuance of the *Bell II* decision, the prohibited activities have thus far been expanded to include general recreation, such as walking along the wet sand, entry and exit for swimming, sunbathing, frisbee-throwing, and picnicking.  *Bell II*, 557 A.2d at 175-76.

fear that the Court's holding will become enshrined in increasingly uncorrectable law.

[¶38] As Justice Wathen wrote eloquently in his dissent to *Bell II*: "This Court's opinion does nothing to dispel the obvious conclusion that from this moment on, at Moody Beach and every other private shore in Maine, the public's right even to stroll upon the intertidal lands hangs by the slender thread of the shore owners' consent. I will not hazard a guess whether that consent will be forthcoming. In my judgment, the public rights should not be so quickly and completely extinguished." *Id.* at 192 (Wathen, J., dissenting).

[¶39] Although judicial efforts to loosen the strings of *Bell II* have been undertaken—for example, in the strained interpretation of "navigation" in *McGarvey v. Whittredge*, 2011 ME 97, ¶¶ 72-77, 28 A.3d 620 (Levy, J., concurring)—these anemic efforts have failed to do what must be done. Although three of the six sitting Justices sought to avoid further enshrining the constrictive trilogy in Maine law, no majority holding to that effect occurred, *id.* ¶¶ 1, 53 (Saufley, C.J., concurring), thus leaving in place the jurisprudence that led to the tortuous shoehorning of various activities into the constrictive trilogy by declaring the simple walk of a scuba diver across the intertidal zone to the

ocean as fitting into the definition of "navigation." *Id.* ¶¶ 72-77 (Levy, J., concurring).

[¶40] As time marches on, concepts of stare decisis may begin to take root in this critical aspect of Maine law, and Maine landowners, understandably, may begin to rely on the restrictions placed on the public's access to the intertidal zone.[13] The *Bell II* decision was built in great part on a literal reading of the Colonial Ordinance, 557 A.2d at 175 ("The Massachusetts court noted that the Colonial Ordinance mentioned no public rights except for fishing, fowling, and navigation."), which was actually no longer extant at the time of

---

[13] The doctrine of stare decisis preserves the reliance interests of the public by counseling adherence to the previously established rule of law created by precedent:

> Litigants have a right to transact business with reference to the law enunciated by the court. Most valuable property rights may be predicated upon the law, as thus declared. These rights should not be impaired nor sacrificed by a reversal or modification of the law except upon cogent and necessary reasons. Stability of the law should be the one great outstanding feature of jurisprudence upon which the profession as well as the people should have a right to rely. . . .

*Jordan v. McKenzie*, 113 Me. 57, 59, 92 A. 995 (1915); *see Adams v. Buffalo Forge Co.*, 443 A.2d 932, 935 (Me. 1982) ("Courts properly seek to create a framework of continuity amidst a universe of continuous change in order that those citizens and litigants who rely upon the legal doctrines and principles they announce may conduct their day-to-day affairs without fear that their reasonable expectations will be torn asunder by an unforeseen and radical departure from precedent.").

If we do not stem the tide of *Bell II*'s influence now, therefore, we fear that stare decisis will impose rigid results "restrained by the bonds of the past" that perpetuate a "cultural lag of unfairness and injustice"—exactly the consequence we must take care to avoid. *Moulton v. Moulton*, 309 A.2d 224, 228 (Me. 1973); *see Adams*, 443 A.2d at 935 (discussing that the court's discretion in determining whether to apply stare decisis in a given matter "must be exercised with a view to whether adherence to past error or departure from precedent constitutes the greater evil to be suffered").

Maine's statehood, *see McGarvey*, 2011 ME 97, ¶¶ 29-30, 28 A.3d 620 (Saufley, C.J., concurring).  That decision—*Bell II*—has been questioned, *see Eaton*, 2000 ME 176, ¶¶ 50-55, 760 A.2d 232 (Saufley, J., concurring); pretzeled, *see McGarvey*, 2011 ME 97, ¶¶ 72-77, 28 A.3d 620 (Levy, J., concurring); and avoided, *see id.* ¶¶ 48-49 (Saufley, C.J., concurring)**.**  Accordingly, because of the passage of time, which will eventually diminish the ability of the Court to correct the wrong created by the *Bell II* decision, we would take this opportunity to correct the judicial error that restricted the rights of the public to engage in reasonable ocean-related activities that do not interfere with the upland owners' peaceful enjoyment of their own property or their right to wharf out.

[¶41]  The 1989 decision in *Bell II* erroneously limited the public's *reasonable and nonabusive use* of the intertidal zone.  That use should include the right to walk unfettered upon the wet sand of Maine beaches to peacefully enjoy one of the greatest gifts the State of Maine offers the world.

[¶42]  Simply put, we would overrule *Bell II* once and for all.  We would adopt the original Wathen analysis, *Bell II*, 557 A.2d at 180-92 (Wathen, J., dissenting), and allow the common law of public access and use of the intertidal

zone to continue to develop as it has over the centuries. The public deserves our correction.

[¶43] We would then, as the Court has done today, conclude that, even according to the public's *common law access* rights to the intertidal zone, the public does not have the right to take attached plant life from that property in contradiction to the fee owner's wishes—not because such activity falls outside of the constrictive trilogy, but because the taking of attached flora from fee owners was not within the reasonable access contemplated when the *jus publicum* was established.[14]  *See id.* at 180-81, 189.

---

Benjamin M. Leoni, Esq. (orally), Curtis Thaxter LLC, Portland, for appellant Acadian Seaplants Limited

Gordon R. Smith, Esq. (orally), Verrill Dana, LLP, Portland, for appellees Kenneth W. Ross, Carl E. Ross, and Roque Island Gardner Homestead Corporation

Catherine R. Connors, Esq. (orally), Pierce Atwood LLP, Portland, for amicus curiae Maine Department of Marine Resources

---

[14] Of note, the people of Rhode Island have amended their state constitution to allow the public to take seaweed, even when attached to the land: "The people shall continue to enjoy and freely exercise all of the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state, including but not limited to fishing from the shore, the gathering of seaweed, leaving the shore to swim in the sea and passage along the shore; and they shall be secure in their rights to the use and enjoyment of the natural resources of the state with due regard for the preservation of their values . . . ." R.I Const. art. I, § 17 (LEXIS through ch. 2 of the Jan. 2019 Session).

Brian W. Thomas, Esq., Stocking & Thomas, LLC, Lamoine, for amicus curiae Downeast Coastal Conservancy

Karin Marchetti-Ponte, Esq., Maine Coast Heritage Trust, Mount Desert, for amicus curiae Maine Coast Heritage Trust

John A. Churchill, Esq., Calais, for amicus curiae Cobscook Bay Fishermen's Association

Mary A. Denison, Esq., Lake and Denison, Winthrop, for amici curiae Maine Clammers Association, Independent Maine Marine Worm Harvesters Association, North American Kelp, and Gulf of Maine, Inc.

Robert Miller, Dean W. Alley, Wendell Alley, Shawn L. Alley, Nathan Fagonde, and Ordman Alley Jr., amici curiae, jointly as "Jonesport and Beals Commercial Fishermen and Lobstermen"

Severin M. Beliveau, Esq., Jonathan G. Mermin, Esq., and Matthew S. Warner, Esq., Preti Flaherty Beliveau & Pachios, LLP, Portland, for amicus curiae Maine Seaweed Council

Leah B. Rachin, Esq., and Benjamin T. McCall, Esq., Bergen & Parkinson, LLC, Kennebunk, for amicus curiae Hale Miller

Gerard P. Conley., Jr. Esq., Cloutier, Conley & Duffett, P.A., Portland, for amicus curiae Downeast Lobstermen's Association

Kurt E. Olafsen, Esq., Olafsen & Butterfield, LLC, Portland, for amicus curiae Maine Coast Fishermen's Association

Mariah D. Mitchell, Esq., Eaton Peabody, Brunswick, for amicus curiae Pleasant River Wildlife Foundation

Sean Mahoney, Esq., Conservation Law Foundation, Portland, for amicus curiae Conservation Law Foundation

Ryan P. Dumais, Esq., Eaton Peabody, Brunswick, for amici curiae Pacific Legal Foundation and Property and Environment Research Center

Washington County Superior Court docket number CV-2015-22
FOR CLERK REFERENCE ONLY